# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
)
UNITED STATES OF AMERICA,      )
)
          v.               )         No. 05-MJ-649-AK
)
CINDY SHEEHAN,          )
)
)
          Appellant.    )
_____ )

## BRIEF FOR APPELLANT

David S. Cohen (D.C. Bar No. 426683)
Jennifer M. O'Connor (D.C. Bar No. 460352)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2445 M Street, N.W.
Washington, D.C. 20037
(202) 663-6000
(202) 663-6363 (facsimile)

*Counsel for Appellant Cindy Sheehan*

# TABLE OF CONTENTS

Page

Table of Authorities ..................................................................................................  ii

Table of Attachments ...............................................................................................  iv

Statement of Facts ....................................................................................................  1

Statement of Jurisdiction .........................................................................................  5

Standard of Review ..................................................................................................  5

Argument...................................................................................................................  5

I.     The NPS Permit Requirement Is Unconstitutional Because It Imposes
       Strict Liability on the Exercise of Protected First Amendment Conduct.........................  5

II.    The Evidence Is Insufficient to Prove Ms. Sheehan Was "Demonstrating"
       Within the Meaning of the Regulation .............................................................  10

       A.     The Evidence Shows Only That Ms. Sheehan Was Sitting on the
              White House Sidewalk, Which Does Not Constitute "Demonstrating." .............  11

       B.     That Ms. Sheehan Expressed Agreement With Those Who
              Were Demonstrating Against the Iraq War Does Not Make
              Her a "Demonstrator." .......................................................................  15

       C.     Generalized Evidence That an Undifferentiated Mass of People
              Were Demonstrating Does Not Support Ms. Sheehan's Conviction. .................  17

III.   The Evidence Is Insufficient to Prove Ms. Sheehan Demonstrated "Without
       a Permit" ............................................................................................  21

Conclusion ...............................................................................................................  25

# TABLE OF AUTHORITIES

Pages

## Cases

*American-Arab Anti-Discrimination Comm. v. City of Dearborn,*
    418 F.3d 600 (6th Cir. 2005) ....................................................................... 7, 9

*Bailey v. United States*, 516 U.S. 137 (1995) ............................................. 11

*Barham v. Ramsey*, 434 F.3d 565 (D.C. Cir. 2006) ....................................... 12, 19, 20

*Dennis v. United States*, 341 U.S. 494 (1951) ............................................. 5

*Forsyth County v. Nationalist Movement*, 505 U.S. 123 (1992) ................................ 16

*Goss v. Lopez*, 419 U.S. 565 (1975) ........................................................ 17

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) ......................................... 24

*In re Winship*, 397 U.S. 358 (1970) ........................................................ 10

*Kotteakos v. United States*, 328 U.S. 750 (1946) ....................................... 11, 17

*Liparota v. United States*, 471 U.S. 419 (1985) ........................................... 9

*Massachusetts v. Microsoft Corp.*, 373 F.3d 1199 (D.C. Cir. 2004) ........................... 5

*Morissette v. United States*, 342 U.S. 246 (1952) ................................... 5, 6, 9

*Quaker Action Group v. Morton*, 516 F.2d 717 (D.C. Cir. 1975) ..................... 9, 16, 22

*Smith v. California*, 361 U.S. 147 (1959) ........................................... 5, 6, 9

*Staples v. United States*, 511 U.S. 600 (1994) ....................................... 6, 9

*Thomas v. United States*, 696 F.Supp 702 (D.D.C. 1988) ...................................... 24

*United States v. Campbell*, 702 F.2d 262 (D.C. Cir. 1983) .................................. 11

*United States v. Cinca*, 56 F.3d 1409 (D.C. Cir. 1995) ......................... 5, 9, 12, 21

*United States v. Dale*, 991 F.2d 819 (D.C. Cir. 1993) ...................................... 11

*United States v. DiLapi*, 651 F.2d 140 (2d Cir. 1981) ...................................... 11

## TABLE OF AUTHORITIES (cont.)

Pages

*United States v. Haldeman*, 559 F.2d 31 (D.C. Cir. 1976) ...................................... 10, 11, 12, 17

*United States v. National Dairy Products Corp.*, 372 U.S. 29 (1963) ......................................... 24

*United States v. Nofziger*, 878 F.2d 442 (D.C. Cir. 1989) ............................................................ 6

*United States v. Taylor*, 937 F.2d 676 (D.C. Cir. 1991) ............................................................... 9

*United States v. U.S. Gypsum Co.*, 438 U.S. 422 (1978) ........................................................ 6, 9

*United States v. X-Citement Video, Inc.*, 513 U.S. 64 (1994) ...................................................... 9

*Zafiro v. United States*, 506 U.S. 534 (1993) ...................................................................... 10, 20

### Statutes and Regulatory Provisions

18 U.S.C. § 3402 .................................................................................................................... 5

36 C.F.R. § 7.96(g)(1)(i) ......................................................................... 7, 10, 12, 14, 18

36 C.F.R. § 7.96(g)(2) ................................................................................................. 1, 4, 7

36 C.F.R. § 7.96(g)(2)(i) .......................................................................................... 7, 10, 21

36 C.F.R. § 7.96(g)(3) .................................................................................................. 2, 22

36 C.F.R. § 7.96(g)(5)(viii) ............................................................................................. 14

36 C.F.R. § 7.96(g)(6) ................................................................................................ 22, 23

Fed. R. Crim. P. 58(g)(2) ............................................................................................... 5

Fed. R. Crim. P. 58(g)(2)(D) .......................................................................................... 5

D.C. Law 15-352, § 105(a) ............................................................................................ 25

D.C. Law 15-352, § 107(f)(2) ......................................................................................... 25

### Additional Sources

O'Malley, *et al.*, Fed. Jury Practice & Instructions – Criminal § 12.13 (5th ed. 2000) ............. 11

**TABLE OF ATTACHMENTS**

Attachment 1        Criminal Docket for Case No. 05-MJ-649-AK

Attachment 2        Judgment and Magistrate Judge Opinion

Attachment 3        Government's Exhibit 1
                    (demonstration permit and associated email correspondence)

Attachment 4        Excepts of Trial Transcript, November 16, 2005

Attachment 5        Excerpts of Trial Transcript, November 17, 2005
(Part A)

Attachment 5        Excerpts of Trial Transcript, November 17, 2005
(Part B)

Attachment 6        Excerpts of Transcript of Bench Ruling, November 17, 2005

Appellant Cindy Sheehan respectfully submits this Brief urging reversal of the judgment

of Magistrate Judge Kay, entered on November 17, 2005, finding appellant guilty of

demonstrating without a permit, in violation of 36 C.F.R. § 7.96(g)(2).[1]

## STATEMENT OF FACTS

Appellant Cindy Sheehan is a mother and peace activist from California.  Her oldest son,

Casey Sheehan, who would have been 26 years old now, was killed on April 4, 2004, while

serving his country in the Iraq war, a war Ms. Sheehan views as illegal and immoral.  Trial Tr.

("Tr.") 99, Nov. 17, 2005 (Attachment 5).  Since losing Casey, Ms. Sheehan has devoted herself

to petitioning her government for redress and seeking an end to the Iraq war.  In service of that

goal, she has written articles, letters to the editor, and letters to members of Congress.  She has

also written to the President of the United States and has asked him to meet with her to discuss

the war and the cause for which her son gave his life.  *Id.* at 99-100.  Ms. Sheehan has also

become active in Gold Star Families for Peace, a support group for families who have lost loved

ones in the war that works "to end the occupation of Iraq so no other families will have to go

through" losses like those suffered by Ms. Sheehan and other group members.  *Id.* at 100-101.

The criminal charge in this case arises out of an antiwar gathering that took place near the

White House on September 26, 2005.  Members of the group Iraq Pledge of Resistance ("IPR")

were the organizers, not Ms. Sheehan or Gold Star Families for Peace.  In July 2005, IPR

submitted applications to the National Park Service ("NPS") for a permit to hold a demonstration

near the White House on September 26, for the purpose of peacefully protesting against the Iraq

war and remembering those killed in it.  *See* Gov't Ex. 1 (Attachment 3).  As amended, the

---

[1] National Park Service ("NPS") regulations govern national parks, including various areas around the White House.  The regulations provide that "demonstrations and special events" generally may be held on such areas "only pursuant to a permit."  36 C.F.R. § 7.96(g)(2).

application included a demonstration on the White House sidewalk.  *See id.*  NPS took no action

on the amended application, which was therefore deemed granted by operation of the NPS

regulations.  *See* 36 C.F.R. § 7.96(g)(3) (applications are deemed granted unless NPS denies the

permit within 24 hours); *see also* Tr. 11-12, 16, Nov. 17, 2005.

  In the days leading up to the demonstration, Gordon Clark of IPR communicated by

email with NPS officials, including Richard Merryman, regarding details of the upcoming event.

Neither Ms. Sheehan or other members of Gold Star Families for Peace were copied on these

emails.  On September 23, well after the permit was deemed granted, Clark emailed Merryman

and others that he did not want the permit for September 26 to include the White House sidewalk

after all.  That same day, only three days before the demonstration, NPS issued a written permit,

which identified only the Ellipse and Lafayette Park as the designated locations of the

demonstration, but also stated that "[c]ivil [d]isobedience [was] also being planned on the White

House sidewalk with approximately 300 individuals participating."  Gov't Ex. 1.  It did not state

that the prior permit had been revoked or specifically address whether the White House sidewalk

was no longer a permissible place to demonstrate.

  According to the trial record, on the day of the demonstration, Ms. Sheehan and four

other members of Gold Star Families for Peace walked up to the White House's northwest gate

to request a meeting with the President in order to present to him their reasons for wanting to end

the Iraq war.  Tr. 101-02, Nov. 17, 2005.  When the guard at the White House gate informed

them that no one would meet with them, the five walked a short distance away from the gate area

and sat down on the White House sidewalk, where Ms. Sheehan remained, undisturbed by

police, for approximately one hour.  *Id.* at 103-04.

While Ms. Sheehan was seated on the sidewalk, hundreds of others were present to demonstrate against the war in Iraq, some of whom had already been in the vicinity of the White House for several hours.  *Id.* at 54; Tr. 76, Nov. 16, 2005 (Attachment 4).  For much of the day, the atmosphere was noisy and "festive."  Tr. 58, 87, 104, 111, 113, Nov. 17, 2005.  Many demonstrators sang and chanted and prayed, *see id.* at 59, 83, 86, 111; Tr. 62, Nov. 16, 2005, while others hung petitions on the White House fence to serve as a "visible presence of opposition to the war," Tr. 85, Nov. 17, 2005.  The demonstration was non-violent, Tr. 76, 141, 162, Nov. 16, 2005, and U.S. Park Police officers were friendly and welcoming, and helped the protesters to obtain food and supplies, Tr. 56-58, 86-87, Nov. 17, 2005.

Around 1:30 p.m., according to the record, a U.S. Park Police officer announced through a loudspeaker that the demonstrators were in violation of NPS regulations and instructed them to leave the area.  The officer repeated this warning three times, once every two to five minutes.  Tr. 51-52, 80, 90, 148-49, 154, Nov. 16, 2005.  Before the first warning, a barricade of bicycle racks had been erected surrounding the sidewalk and the people on it, with only one exit at the far west end.  *Id.* at 63, 144, 164.  Within six to fifteen minutes, the police closed the west end so that no one could leave.  *Id.* at 63.  Once the sidewalk was completely closed off, the hundreds of people remaining on the sidewalk within the enclosure were considered to be under arrest.  *Id.*

To process the arrests, officers picked up arrestees and turned them over to U.S. Park Police officers who were waiting on the road nearby.  Officers at the patrol wagons processed the arrestees, taking photographs and collecting personal property.  Ms. Sheehan, who had been sitting on the White House sidewalk for approximately one hour, was picked up by two SWAT officers who took her to Park Police Officer Holly Davis for processing.  *Id.* at 149-50.  There is

no dispute in the record that no one informed Ms. Sheehan of what she had done wrong or the charges against her until after she had been processed for arrest.  Tr. 107, Nov. 17, 2005.

The persons arrested that day were all criminally charged with demonstrating without a permit on the White House sidewalk, in violation of 36 C.F.R. § 7.96(g)(2).  On November 16, 2005, Ms. Sheehan appeared before Magistrate Judge Kay for arraignment and trial, along with 28 other defendants.  The court held a consolidated proceeding for all defendants, in which Park Police officers who had processed arrestees at the patrol wagons testified as to the arrest of defendants whom they had processed.  Because the testifying officers had observed the defendants mainly during the arrest process, the officers offered only generalized testimony as to the conduct of the demonstration and did not attribute specific acts to identifiable defendants. *See* Tr. 50-53, 62-63, 152-55, Nov. 16, 2005.  Essentially, they testified that there was a demonstration and the defendants were arrested for being present in the cordoned-off area after the demonstration.  As to Ms. Sheehan, Officer Davis testified only that she saw Ms. Sheehan "sitting" on the White House sidewalk after the officers had issued the warnings to leave the area.  *Id.* at 149-50.  The Government introduced no other evidence of Ms. Sheehan's conduct.

Throughout the day-and-a-half long trial, Ms. Sheehan and her co-defendants raised constitutional and necessity defenses and objected to the suggestiveness of the Government's in-court identification procedure.  The defendants also repeatedly argued that the evidence was not sufficient to establish that they had engaged in unlawful conduct or that they lacked a permit for the demonstration.  *See, e.g.* Tr. 47-48, 51-52, Nov. 17, 2005.  Without making particularized findings of guilt as to any individual defendant, Judge Kay entered a mass guilty verdict.  Each defendant was sentenced to a $50 fine plus a $25 fee.  Ms. Sheehan timely filed this appeal.

4

## STATEMENT OF JURISDICTION

This is a direct appeal from a judgment of conviction by a federal Magistrate Judge in a petty offense case. This Court has jurisdiction over this appeal pursuant to 18 U.S.C. § 3402. *See also* Fed. R. Crim. P. 58(g)(2). By minute entry, the judgment of conviction was entered on November 17, 2005, and a timely notice of appeal was filed on behalf of Ms. Sheehan on December 2, 2005. The Magistrate Judge entered a written judgment on December 7, 2005.

## STANDARD OF REVIEW

In an appeal to the District Court from a final judgment in a misdemeanor or petty offense case, the scope of the appeal is the same as in an appeal to the circuit court of appeals from a judgment entered by a district judge. *See* Fed. R. Crim. P. 58(g)(2)(D). In general, therefore, the District Court reviews the Magistrate Judge's legal determinations *de novo*, his findings of fact for clear error, and his discretionary rulings for abuse of discretion. *See, e.g.*, *Massachusetts v. Microsoft Corp.*, 373 F.3d 1199, 1207 (D.C. Cir. 2004). Where, as here, an appellant challenges the sufficiency of evidence, the Court reviews the record *de novo*, considering "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Cinca*, 56 F.3d 1409, 1413 (D.C. Cir. 1995).

## ARGUMENT

I.    **The NPS Permit Requirement Is Unconstitutional Because It Imposes Strict Liability on the Exercise of Protected First Amendment Conduct.**

"The existence of a *mens rea* is the rule of, rather than the exception to, the principles of Anglo-American criminal jurisprudence." *Smith v. California*, 361 U.S. 147, 150 (1959) (quoting *Dennis v. United States*, 341 U.S. 494, 500 (1951)). Tracing the history of the "ancient requirement of a culpable state of mind," the Supreme Court in *Morissette v. United States*, 342

U.S. 246 (1952), noted that the "contention that an injury can amount to a crime only when inflicted by intention is no provincial or transient notion," but is as "universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil." *Id.* at 250. For this reason, laws imposing strict criminal liability, though not invariably impermissible, are "generally disfavored." *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 438 (1978); *see also Staples v. United States*, 511 U.S. 600, 606 (1994).

Imposition of strict liability is especially troubling where it touches on the exercise of First Amendment freedoms. Because a key effect of a strict liability regime is the overdeterrence of the criminalized conduct at issue, *see U.S. Gypsum Co.*, 438 U.S. at 441, holding an individual criminally liable for expressive conduct absent criminal intent threatens to chill protected speech and requires the individual to become the "strictest censor[ ]" of his or her own conduct, *Smith*, 361 U.S. at 152-53; *see also United States v. Nofziger*, 878 F.2d 442, 454 (D.C. Cir. 1989) (noting the "potential for chilling speech" inherent in a strict liability offense). The Supreme Court in *Smith* thus found unconstitutional an ordinance prohibiting a bookseller from possessing books later adjudged to be obscene without any knowledge on the part of the bookseller as to the content of the books. 361 U.S. at 150-55. Noting that the elimination of any *mens rea* requirement would likely cause the bookseller to restrict his sales to those books he had personally inspected, thereby restricting the sale of constitutionally protected materials as well as the obscene, *id.* at 153-54, the Court found the ordinance had "such a tendency to inhibit constitutionally protected expression that it cannot stand under the Constitution," *id.* at 155.

Applying these principles, the Sixth Circuit recently struck down under the First Amendment a permit requirement that imposed strict liability on those who join a permitless

demonstration, regardless of whether they know that no permit was obtained. *American-Arab Anti-Discrimination Comm. v. City of Dearborn*, 418 F.3d 600, 610-13 (6th Cir. 2005). Noting that First Amendment assemblies are likely to attract others to join, *id.* at 611-12, the Sixth Circuit reasoned that the ordinance "place[d] the onus upon every participant to be aware of whether the march has a permit, and would hold any participant liable for its violation, even in cases where the participant was mistakenly advised that a permit was issued," *id.* at 612. As a result, every person wishing to join in solidarity with the demonstration would first have to consult with city officials to ascertain the existence of a permit or risk being jailed, a result the Sixth Circuit properly recognized as "antithetical to our traditions." *Id.*

Like the ordinance invalidated by the Sixth Circuit, the NPS regulation unambiguously contains no *mens rea* element. Neither the provision establishing the permit requirement, 36 C.F.R. § 7.96(g)(2), nor the provision defining "demonstrations," *id.* § 7.96(g)(1)(i), requires that a person know that there is no permit before that person may be convicted of violating the regulation. Indeed, the latter provision expressly requires that a person is guilty of "demonstrating" without a permit even if his or her actions have the "effect" or "propensity" to draw a crowd or onlookers, regardless of his or her intent. *Id.* The danger that the regulation will ensnare those who act with no criminal intent is heightened by the fact that small groups of demonstrators, which are normally exempt from the permit requirement, *id.* § 7.96(g)(2)(i), become subject to the requirement if they are adjudged to be an "extension" of another, larger group, *id.*, whose legal status is quite likely unknown to the members of the smaller group. Similarly, a small group of demonstrators unintentionally becomes subject to the permit requirement if enough onlookers choose to join them to make their group larger than 25. *Id.*

7

In this case, the Government recognized the plain absence of any *mens rea* requirement in the regulations, stating repeatedly that "notice about the existence of the permit or lack of a permit is not an element and not a defense of this violation." Tr. 130, Nov. 17, 2005; *see also id*. at 121-22. The Magistrate Judge agreed that the regulations contain no *mens rea* requirement with respect to the existence of a permit; when a defendant attempted to elicit testimony as to another defendant's state of mind, the Magistrate Judge stated repeatedly that the defendant's intent was "not relevant." *See id.* at 61-62.

Given the undisputed absence in the NPS regulation of any *mens rea* requirement, a person may be held to have violated the regulation by demonstrating without any knowledge as to the lack of a permit, even where the person holds a reasonable, good faith – but mistaken – belief that a permit exists. This flaw is well illustrated by the evidence in this case. As the Magistrate Judge found, "there was no testimony as to how the individual Defendants . . . knew that a permit had in fact been issued if in fact they knew about it." Tr. of Bench Ruling 10, Nov. 17, 2005. The Government presented no evidence to show that Ms. Sheehan or any other defendant knew there was a permit.[2] And given the NPS's failure validly to revoke the permit that had been deemed granted for IPR to demonstrate on the White House sidewalk, *see infra* at 23-25, or to give any notice of that purported revocation, there is no question that the alleged demonstrators lacked any culpable state of mind with respect to the existence of a permit.

Because the NPS regulations impose strict criminal liability without requiring any *mens rea* as to the existence or lack of a permit, the regulations are invalid under the First Amendment

---

[2] Ms. Sheehan testified that she found out that she was charged with violating the permit requirement only after her arrest. Tr. 107, 109-10, Nov. 17, 2005. Another defendant testified that she did not know whether anyone had a permit. *Id.* at 82.

and Ms. Sheehan's conviction was unconstitutional.[3]  It is no answer to say that the NPS permit

requirement is a mere regulatory violation.  While the government may enact "public welfare"

offenses without any mental element, such offenses typically concern "type[s] of conduct that a

reasonable person should know [are] subject to stringent public regulation and may seriously

threaten the community's health or safety."  *Liparota v. United States*, 471 U.S. 419, 433 (1985);

*see also Staples*, 511 U.S. at 606-07; *Morissette*, 342 U.S. at 254-56.  Plainly, the exercise of

First Amendment rights does not fall into that category, *see United States v. X-Citement Video,

Inc.*, 513 U.S. 64, 71-72 (1994), and the Supreme Court has squarely rejected the claim that a

strict liability ordinance restricting the freedom of expression may be rationalized as a public

welfare offense, *Smith*, 361 U.S. at 152-53.[4]

Nor could this Court properly construe the NPS regulations to contain a *mens rea*

element.  While canons of construction such as the presumption against strict liability, the rule of

lenity, and the rule of constitutional avoidance often compel federal courts to impose a saving

construction on a federal statute that appears to omit any element of scienter, *see, e.g.*, *X-

Citement Video*, 513 U.S. at 68-70; *Liparota*, 471 U.S. at 427; *U.S. Gypsum Co*¸ 438 U.S. at 437,

these canons play no role in statutory interpretation unless the provision to be interpreted is

ambiguous, *United States v. Taylor*, 937 F.2d 676, 681-82 (D.C. Cir. 1991).  Here, there can be

no question that the NPS regulation unambiguously fails affirmatively to require criminal intent;

---

[3] The D.C. Circuit cases addressing the validity under the First Amendment of the NPS permit
system do not address the issue of strict liability.  *See United States v. Cinca*, 56 F.3d 1409 (D.C.
Cir. 1995); *Quaker Action Group v. Morton*, 516 F.2d 717 (D.C. Cir. 1975).

[4] Similarly, the relatively lenient penalties provided for in the NPS regulation do not save that
regulation from unconstitutionality. The Dearborn ordinance struck down by the Sixth Circuit
carried even lesser penalties, *see American-Arab Anti-Discrimination Comm.*, 418 F.3d at 603,
and the Supreme Court's disapproval in *Smith* of the imposition of strict liability in the First
Amendment context contemplated no exception for crimes of lesser magnitude.

to the contrary, it requires the imposition of criminal liability on those whose actions have the mere "effect" or "propensity" to draw onlookers, 36 C.F.R. § 7.96(g)(1)(i), and on those who would not even be subject to the permit requirement but for the coincidence of their demonstrating alongside a larger group whose permit status is a mystery, or their being joined by a small number of onlookers who happen to bring their number over 25, *id.* § 7.96(g)(2)(i). Moreover, as noted, *see supra* at 8, the Government in this case specifically rejected the contention that notice of the existence or lack of a permit was an element of the charged offense. *See* Tr. 121-22, 130, Nov. 17, 2005. In any event, even if this Court were to construe the NPS regulations to require that a person know that she has no permit before she may be convicted of demonstrating without a permit, the Government failed to present evidence that Ms. Sheehan had any such knowledge. *See id.* at 107, 109-10; Tr. of Bench Ruling 10, Nov. 17, 2005. Therefore, even if the regulation could be saved from unconstitutionality by construing it to require a criminal intent – which it cannot – Ms. Sheehan's conviction cannot stand.

**II.    The Evidence is Insufficient to Prove Ms. Sheehan Was "Demonstrating" Within the Meaning of the Regulation.**

It is a bedrock principle of fairness and due process in any criminal trial that "[e]ach defendant is entitled to have his or her case determined from his or her own conduct and from the evidence [that] may be applicable to him or her." *Zafiro v. United States*, 506 U.S. 534, 541 (1993) (citation omitted).[5] Even where the convenience of the court calls for the trial of several defendants together, guilt "remains individual and personal . . . . It is not a matter of mass

---

[5] *See also In re Winship*, 397 U.S. 358, 364 (1970) ("Due process commands that no man shall lose his liberty unless the Government has borne the burden of . . . convincing the factfinder of *his* guilt." (citation omitted; emphasis added)); *United States v. Haldeman*, 559 F.2d 31, 72 (D.C. Cir. 1976) (approving jury instruction that the trier of fact should "consider only a defendant's own words and acts in determining whether" he or she committed the charged offense and "must consider the guilt or innocence of each defendant separately and independently").

application." *Kotteakos v. United States*, 328 U.S. 750, 772 (1946). For this reason, when a court reviews a conviction for sufficiency of evidence, the court must consider whether the evidence particular to the individual defendant establishes every element of the offense as to that individual defendant. *See, e.g.*, *Bailey v. United States*, 516 U.S. 137, 150-51 (1995); *United States v. Dale*, 991 F.2d 819, 832-39 (D.C. Cir. 1993); *see also United States v. Campbell*, 702 F.2d 262 (D.C. Cir. 1983) (where record evidence failed specifically to connect appellant to illegal action, and where trial court refused to instruct the jury to consider each defendant's guilt separately, evidence was insufficient to support appellant's conviction even though co-defendants' convictions were proper).[6] Here, the Government presented no evidence particular to Ms. Sheehan to show that she herself was demonstrating without a permit. Nor did the court make any particularized findings regarding Ms. Sheehan's or the other defendants' guilt.

> ### A. The Evidence Shows Only That Ms. Sheehan Was Sitting on the White House Sidewalk, Which Does Not Constitute "Demonstrating."

In this case, Ms. Sheehan does not dispute that on the day of her arrest, hundreds of people had gathered near the White House to express their opposition to the war in Iraq and that many of them were singing, chanting, praying, or otherwise "demonstrating" within the meaning of the NPS regulations. And Ms. Sheehan does not dispute that she was at the White House while this activity was underway. Yet these circumstances do not relieve the Government of its burden of proving that Ms. Sheehan herself, by her "own words and acts," *Haldeman*, 559 F.2d

---

[6] Similarly, where multiple defendants are tried together, juries are routinely instructed to "give separate and individual consideration to each charge against each defendant." Kevin F. O'Malley, *et al*., 1A Fed. Jury Prac. & Instr. – Criminal § 12.13 (5th ed. 2000); *see also United States v. DiLapi*, 651 F.2d 140, 146 (2d Cir. 1981) ("[T]he fundamental precept that guilt is individual must be observed in the deliberative process. For this reason, juries in multi-defendant trials are instructed . . . to give separate and individual consideration to the case against each defendant.").

at 72, was "demonstrating." The Government introduced no evidence as to Ms. Sheehan's conduct that, considered "separately and independently," *id.*, would allow a rational trier of fact to conclude that her conduct amounted to "demonstrating." By relying instead on generic testimony that an undifferentiated mass of protesters were engaged in a demonstration, the Government failed to meet its burden of proof that Ms. Sheehan "demonstrated" that day.

The NPS regulations under which Ms. Sheehan was convicted define "demonstrations" to include "demonstrations, picketing, speechmaking, marching, holding vigils or religious services and all other like forms of *conduct* which involve the communication or expression of views or grievances, engaged in by one or more persons, the conduct of which has the effect, intent or propensity to draw a crowd or onlookers." 36 C.F.R. § 7.96(g)(1)(i) (emphasis added). Notably, the term "does not include casual park use by visitors or tourists which does not have an intent or propensity to attract a crowd or onlookers." *Id.* The regulations thus tie the definition of "demonstration" to a participant's actual activities; physical presence at the scene of a demonstration alone does not constitute the offense of "demonstrating." The D.C. Circuit has thus recognized that all individuals who are physically present at a demonstration are not necessarily demonstrating. *See Cinca*, 56 F.3d at 1414 (distinguishing between demonstration participants and individuals who are present "without having joined the group"); *see also Barham v. Ramsey*, 434 F.3d 565, 574 (D.C. Cir. 2006) (distinguishing individuals engaged in allegedly illegal assembly from lawful bystanders).

In reaching his verdict, the Magistrate Judge made no particularized findings as to Ms. Sheehan's conduct prior to her arrest.[7] Although Ms. Sheehan explicitly testified that she "wasn't demonstrating" on the day of her arrest, Tr. 107, Nov. 17, 2005, the Magistrate Judge

---

[7] Indeed, the Magistrate Judge made no individualized findings as to any defendant.

never addressed whether the Government had introduced evidence to show that Ms. Sheehan's specific actions that day amounted to "demonstrating."  In fact, the Government's only evidence of Ms. Sheehan's own conduct on the day of her arrest was the testimony of her processing officer, Holly Davis.  When asked what she had observed Ms. Sheehan doing, Officer Davis stated that she saw Ms. Sheehan sitting on the sidewalk after the Park Police had issued warnings to disperse.  Tr. 149-50, Nov. 16, 2005.  That was the sum total of Officer Davis's testimony as to Ms. Sheehan – Officer Davis did not testify that she saw Ms. Sheehan picketing, making a speech, marching, praying, chanting, singing, or undertaking any other like form of conduct. The officer's testimony that Ms. Sheehan remained on the sidewalk after the warnings were given is irrelevant, because that does not constitute "demonstrating," and because Ms. Sheehan was not arrested for or charged with failing to obey a lawful order to disperse.

Ms. Sheehan's own testimony similarly did not establish that she was "demonstrating" prior to her arrest.  Ms. Sheehan testified that she went to the White House with four other members of Gold Star Families for Peace.[8]  She and her companions went to the White House gate – an area not under Park Police jurisdiction and not subject to NPS permit requirements, *see* Tr. 28-29, 32-33, Nov. 17, 2005 – and asked to meet with the President.  When that meeting was refused, the record shows only that Ms. Sheehan and her companions walked 15 to 20 feet down the White House sidewalk and sat down, where Ms. Sheehan remained for about an hour.  *Id.* at 103-04.  Although she testified that there were people chanting, singing, and praying around her, no one testified that Ms. Sheehan participated in those activities.  *Id.* at 111.

---

[8] Although Ms. Sheehan indicated that she joined with other people in "marching" to the White House gate, *see* Tr. 100, Nov. 17, 2005, that conduct is not relevant to the offense with which she was charged, since it did not occur on the White House sidewalk.

13

In sum, the evidence and the Government's case against Ms. Sheehan collapses to the contention that simply sitting down on a sidewalk where a demonstration is taking place constitutes "demonstrating." That contention fails. Nothing in the NPS regulations indicates that the passive act of sitting constitutes demonstrating. The regulations define "demonstration" as "demonstrations, picketing, speechmaking, marching, holding vigils or religious services and *all other like forms of conduct* which involve the communication or expression of views or grievances." 36 C.F.R. § 7.96(g)(1)(i) (emphasis added). The definition thus does not embrace "all forms" of conduct which involve the expression of views, but instead includes "all *like* forms of conduct" which involve the expression of views; that is, forms of conduct that are "like" the enumerated actions of picketing, speechmaking, marching, or holding vigils or religious services. Those enumerated actions are all proactive, affirmative steps that are inherently expressive. Sitting, without more, is simply not a "like" form of conduct when viewed in the company of those other actions.[9] Nor does anything else in the regulations prohibit sitting on the White House sidewalk.[10] Thus, the only act that the evidence specifically attributes to Ms. Sheehan – just plain sitting – does not bring her conduct within the definition of "demonstration."

_____

[9] In some situations, sitting could be an act of demonstration – lunch counter sit-ins during the civil rights movement, for example. There, however, the purpose of such protests was to challenge policies and practices that barred African-Americans from sitting at or otherwise using facilities reserved for whites. Since the intent of the demonstration was to protest a policy that prohibited sitting, the act of sitting was not the passive action that it ordinarily is (and was in this case), but was instead a powerful and assertive means of communicating the protestors' views.

[10] The only provision in the regulations regarding sitting is that a demonstrator carrying a sign or placard must "continue to move along the sidewalk," 36 C.F.R. § 7.96(g)(5)(viii), and stopping to sit while holding a sign would thus constitute a violation of that regulation. Although two Park Police officers testified at trial that the mere act of sitting (even without a sign) violates the regulations, *see* Tr. 147, 155, Nov. 16, 2005, the officers were plainly wrong. As there was no evidence that Ms. Sheehan was carrying any kind of sign or placard, she did not violate any regulation by sitting down. Nor, in any event, was Ms. Sheehan charged with violating the regulation regarding sitting with a sign or placard, 36 C.F.R. § 7.96(g)(5)(viii).

**B.    That Ms. Sheehan Expressed Agreement With Those Who Were Demonstrating Against the Iraq War Does Not Make Her a "Demonstrator."**

Ms. Sheehan also testified that while sitting on the sidewalk, she was "expressing her view" against the war in Iraq.  Tr. 108, Nov. 17, 2005.  The fact that Ms. Sheehan was "expressing her views" while sitting near others who are demonstrating, however, cannot support the conclusion that Ms. Sheehan was engaging in the type of conduct defined in the regulation. Mere expression of views, untethered to a form of conduct similar to the forms delineated in the NPS regulations, does not constitute "demonstrating" within the meaning of those regulations.

The need for such a limitation in the definition is clear.  One can easily imagine any number of situations in which a person might express a view in a manner that does not approach the traditional understanding of a "demonstration."  A pair of tourists who engage in an ordinary conversation about a matter of public policy while strolling on the White House sidewalk are "expressing their views."  People debating the wisdom of the Iraq war over lunch or a chess game in Lafayette Park no doubt are "expressing their views."  Plainly, to say that any of these people were "demonstrating" would stretch the common understanding of that word beyond recognition.  Thus, that Ms. Sheehan acknowledged that she was "expressing her views" when she was sitting on the White House sidewalk – in the absence of any evidence in the record that she was engaged in any conduct "like" the actions identified in the regulatory definition – does not support the finding that she was "demonstrating" within the meaning of the regulation.

More fundamentally, any attempt to define the offense of "demonstrating" by reference to the mere expression of views, unaccompanied by any conduct that amounts to "demonstrating," cannot be sanctioned in light of the important First Amendment principles that

limit the government's ability to create a permit requirement in the first place.[11]  According to

her own testimony, while sitting on the White House sidewalk, Ms. Sheehan was "join[ing] in

solidarity with the people present" and with the "millions of people around the country" who

shared the demonstrators' views on the Iraq war.  *Id.* at 99.  Ms. Sheehan cannot be called a

"demonstrator" just because she agreed with the demonstrators' views, any more than could a

person who watched the demonstration from a nearby office building and felt solidarity in a

common opposition to the war.  The regulations cannot be interpreted to require that a person

who does not engage in a concrete act of "demonstrating" must nonetheless obtain a permit for

merely expressing agreement with the views of a group of people who are demonstrating.  Such

a reading would convert the NPS permit requirement from a reasonable restriction on the time,

place, and manner of conducting an actual demonstration into an impermissible content- and

viewpoint-based regulation of speech.  Indeed, such a reading would permit the conviction of

any tourist in the vicinity who wore a T-shirt protesting the war – which clearly is not

constitutionally allowed.  The regulations' requirement that a person undertake a specific,

affirmative act (like marching, picketing, and so forth) in order to be "demonstrating" is

therefore essential to the permit requirement's validity.  Since the Government presented no

evidence that Ms. Sheehan engaged in any such conduct, her conviction cannot stand.

---

[11] *See Forsyth County v. Nationalist Movement*, 505 U.S. 123, 130 (1992) ("[A]ny permit
scheme controlling the time, place, and manner of speech must not be based on the content of the
message.").  When the D.C. Circuit approved the general framework of the NPS permit
requirement, it did so "on the assumption" that the NPS regulations would define the occasions
requiring a permit "in terms that do not impermissibly discriminate against First Amendment
activity, *e.g.*, whether a person has a sign, or whether the sign has an acceptable message."
*Quaker Action Group v. Morton*, 516 F.2d 717, 728 (D.C. Cir. 1975).

**C.      Generalized Evidence That an Undifferentiated Mass of People Were Demonstrating Does Not Support Ms. Sheehan's Conviction.**

Rather than introduce any particularized evidence that Ms. Sheehan herself was "demonstrating," the Government rested its case instead on the testimony of various processing officers, who offered generalized characterizations of the activities of the crowd as a whole without identifying any individual defendants as having taken any specific actions that would amount to "demonstrating." *See, e.g.*, Tr. 50-51, 59, 61-63, 88, 152-55, Nov. 16, 2005. None testified to observing Ms. Sheehan or any other individual defendant engage in any specific conduct constituting "demonstrating."[12] That failure is fatal in light of the fundamental notion that guilt is "individual and personal," *Kotteakos*, 328 U.S. at 772, and must be determined "separately and independently" for each defendant, *Haldeman*, 559 F.2d at 72.[13]

Sensing its weakness on this point, the Government inquired at trial of some of the Park Police officers how they knew that the persons they arrested were actually demonstrators and not tourists in the vicinity. Each officer answered the same way: the arrestees must have been demonstrating because they were present on the White House sidewalk after the police issued warnings to leave. *See* Tr. 63-64, 90-91, 123, 145, 155, Nov. 16, 2005 (testimony of Officers Johnson, Fuller, Davis, and Clark). The inference the Government hoped to cultivate with this testimony is that only a demonstrator would have remained on the sidewalk after the warnings.

---

[12] Three of the other defendants who were tried along with Ms. Sheehan similarly described the events of the day in their testimony, acknowledging that unidentified members of the crowd were singing, chanting, praying, and holding signs; but none of the witnesses stated that he or she saw Ms. Sheehan engage in any such conduct. Tr. 59, 83, 86, Nov. 17, 2005.

[13] *Cf. Goss v. Lopez*, 419 U.S. 565, 580-81 n.9 (1975) (recognizing, in the procedural due process context, that even where the government's need to impose order is great, due process requires the "gathering [of] facts relating to [the defendant] specifically," and criticizing "mass arrests" as failing to "guarantee[ ] careful individualized factfinding").

For several reasons, this inference does not compensate for the Government's failure to present any particularized evidence that Ms. Sheehan was actually "demonstrating" before her arrest. Most notably, as discussed above, *see supra* at 12, the definition of "demonstration" in the regulations is necessarily keyed to the conduct of the purported demonstrator, not to his or her mere physical presence at the scene of a demonstration. The regulations specifically distinguish between persons on the scene who are "demonstrators" and those who are merely visitors, tourists, or onlookers. 36 C.F.R. § 7.96(g)(1)(i). Indeed, the regulations contemplate that a demonstration is likely to attract onlookers, *id.*, and whether they pause to observe out of a sense of solidarity with the demonstrators or out of idle curiosity, those onlookers plainly are not themselves "demonstrators" just because they happen to be standing (or sitting) nearby.

In addition, there are a host of reasons why a person who is not "demonstrating" might be found in the area of a demonstration, even after a warning to disperse is given. A person who was not demonstrating might have thought he was not the target of the order to disperse, precisely because he was not "demonstrating." Or, the same curiosity that attracts an onlooker to the scene of a demonstration in the first place would likely incline the person to stay and observe a mass arrest. Or, in this case, there was testimony from multiple witnesses that they did not hear the warnings due to other noise. *See* Tr. 83, 87, Nov. 17, 2005.[14] Further, given that the police erected barriers around all but the west end of the long sidewalk before issuing warnings, it is highly likely that some people within the perimeter thought they were already trapped and

---

[14] *See also* Tr. 104, 111, 113, Nov. 17, 2005. Ms. Sheehan likewise said that from her position on the sidewalk she could not communicate with people in the middle of the road, and that even with the peaks and lulls in the noise level, it was never quiet around her. *Id.* at 111, 113.

there was no egress, even before police closed off the west end and began processing arrests.[15]
The Government's assumption that all persons who remained on the sidewalk after the warnings
were necessarily "demonstrators" is thus pure speculation and cannot substitute for record
evidence that Ms. Sheehan herself was in fact "demonstrating" prior to her arrest.[16]

      The Government's attempt to premise Ms. Sheehan's guilt upon the assumption that
anyone who happened to be present at the demonstration must have engaged in criminal activity,
despite the complete absence in the record of any individualized evidence of such conduct, bears
striking resemblance to the police conduct the D.C. Circuit recently rebuked in *Barham v.
Ramsey*, 434 F.3d 565 (D.C. Cir. 2006). In that case, the D.C. Metropolitan Police Department,
responding to a demonstration in Pershing Park in northwest Washington, cordoned off the
perimeter of the park without warning and arrested everyone within the perimeter. *Id.* at 568.
The court of appeals concluded that, in the absence of particularized probable cause as to each
and every person in the park, the assistant police chief who ordered the arrests had shown no
"objective basis for arresting the entire mass of people who happened to inhabit the park." *Id.* at
574. In language that serves equally well in this case, the court stated:

> Even to the extent that [the assistant police chief] asserts that some "demonstrators" were
> unlawfully assembled in the park, he has made no effort to ascribe misdeeds to the
> specific individuals arrested. Nowhere have appellants suggested that the particular

---

[15] Given that only two to five minutes elapsed between each of the three warnings, those on the
sidewalk who did hear the announcements and wished to leave may have had as little as six
minutes to do so. Tr. 51-52, 80, 90, 148-49, 154, Nov. 16, 2005. And in that space of time, they
would have had to leave the area by climbing over police barricades (something most people are
hesitant to do in our heightened-security times) or walking the equivalent of two blocks, unless
they were already located at the west end of the sidewalk, which was the only area of the
sidewalk not blocked until after the last warning. *Id.* at 63, 144, 164; Tr. 59, Nov. 17, 2005.

[16] Regardless of whether the Government could have charged those who remained in the area
after the warnings with failure to obey an order to disperse, failing to disperse is not
"demonstrating," and Ms. Sheehan was never charged with failure to disperse.

individuals observed committing violations were the same people arrested; instead, they refer generally to what "demonstrators" were seen doing. This is the upshot of making arrests based on the [arrestees'] occupancy of a randomly selected zone, rather than participation in unlawful behavior. While we have no reason to doubt that unlawful activity might have occurred in the course of the protest . . . the simple, dispositive fact here is that appellants have proffered no facts capable of supporting the proposition that [the assistant police chief] had reasonable, particularized grounds to believe every one of the 386 people arrested was observed committing a crime.

*Id.*; *see also id.* ("There is no indication of how an officer might distinguish between a 'demonstrator' and a person walking to work or enjoying a stroll through the park, let alone how one would distinguish someone engaged in an allegedly illegal assembly from a passerby interested in hearing the political speech of the protestors.").

Although *Barham* considered the probable cause requirement of the Fourth Amendment rather than the standard for sufficiency of the evidence, the holding of that case remains highly relevant, for both the standard of probable cause to arrest and the burden of proof to convict require evidence that is specific to the individual arrested or charged. *Compare id.* at 573 ("[A] search or seizure of a person must be supported by probable cause *particularized with respect to that person*." (emphasis added and citation omitted)), *with Zafiro*, 506 U.S. at 541 ("Each defendant is entitled to have his or her case determined *from his or her own conduct and from the evidence [that] may be applicable to him or her.*" (emphasis added and citation omitted)). In this case, as in *Barham*, the Government attempts to establish the guilt of an "undifferentiated mass of people," *Barham*, 434 F.3d at 568, on the basis of evidence that some unspecified individuals within that mass of people were engaged in conduct that constituted "demonstrating." And just as in *Barham*, where the mere presence of each arrestee at the scene of the demonstration did not supply probable cause to justify his or her arrest, so too does the mere presence of Ms. Sheehan on the White House sidewalk fail to supply sufficient particularized evidence to prove, beyond a reasonable doubt, that she "demonstrated" within the meaning of the NPS regulations.

20

In sum, the totality of the Government's evidence concerning Ms. Sheehan's own conduct on the day of her arrest establishes that the only activity she undertook on the White House sidewalk was to sit down. And she explicitly testified that she was not demonstrating. Tr. 107, Nov. 17, 2005. That others around her may have engaged in conduct that falls within the definition of "demonstrating," or that she remained in the area even after the Park Police issued their warnings, does not convert that evidence into evidence that she was actively demonstrating on the sidewalk. Given this lack of evidentiary support for the charge, no rational trier of fact could have found beyond a reasonable doubt that Ms. Sheehan was "demonstrating" without a permit on the White House sidewalk. The conviction must therefore be reversed.

**III.    The Evidence Was Insufficient to Prove Ms. Sheehan Demonstrated "Without a Permit."**

Even assuming, *arguendo*, that the Government established that Ms. Sheehan was "demonstrating" on the White House sidewalk – which it did not – the Government would still have to show that there was no permit for the activity. The evidence shows, however, that Ms. Sheehan was required to obtain a permit only if she was an "extension" of a larger group of protesters, namely, the Iraq Pledge of Resistance.[17] And if her conduct indeed made her a de facto member of that group, then any permit that was valid and in effect as to IPR was valid and in effect as to Ms. Sheehan. *See United States v. Cinca*, 56 F.3d 1409, 1414 (D.C. Cir. 1995)

---

[17] Undisputed evidence indicates that Ms. Sheehan went to the White House sidewalk with only four other members of Gold Star Families for Peace, Tr. 100, Nov. 17, 2005, after being turned away at the White House gate. The White House gate itself is outside U.S. Park Police jurisdiction; no NPS permit is required to approach the gate. *Id*. at 28-29, 32-33 (testimony of Merryman). Ms. Sheehan therefore needed a permit, if at all, only for her subsequent activity on the White House sidewalk. But groups of 25 persons or fewer are exempt from the NPS permit requirement, unless the group is "merely an extension of another group already availing itself of the 25-person maximum." 36 C.F.R. § 7.96(g)(2)(i). Since Ms. Sheehan arrived on the sidewalk with only four other people, she was required to have a permit only if she and her Gold Star Families companions were "merely an extension" of another group that was demonstrating there.

("Once [the defendant] joined the group, he was subject to the regulations governing the group's demonstration."). Because the evidence is not sufficient to show, beyond all reasonable doubt, that IPR did not have a valid permit to demonstrate on the White House sidewalk, the evidence is not sufficient to support Ms. Sheehan's conviction.

The NPS regulations provide that all applications for permits to demonstrate are deemed granted unless denied within 24 hours of receipt. 36 C.F.R. § 7.96(g)(3). The D.C. Circuit has described this deadline as "essential" to the coexistence of the NPS permit system and the First Amendment rights of would-be demonstrators. *Quaker Action Group v. Morton*, 516 F.2d 717, 735 (D.C. Cir. 1975). Once a permit is deemed granted by operation of this rule, the NPS Regional Director may revoke the permit prior to the demonstration, but must do so in writing and only upon a specific ground for which an application would be subject to denial in the first instance. 36 C.F.R. § 7.96(g)(3), (g)(6); *see also Quaker Action Group*, 516 F.2d at 735 (holding that withdrawal of a permit that has been issued or deemed granted "should be the subject of express standards" and "should be exercised only in accordance with those standards").

The NPS admitted that because IPR added the White House sidewalk to its July 2005 application, a permit for IPR to demonstrate on the White House sidewalk was deemed issued 24 hours after the submission of that application. Tr. 11-12, 16, Nov. 17, 2005 (testimony of Merryman). Despite this unqualified statement by the senior NPS official who approved the IPR permit, the Magistrate Judge erroneously held that the permit had not yet issued when, just days before the demonstration, a representative of IPR emailed Merryman to ask that the permit not cover the White House sidewalk. *See* Judgment at 5 (Attachment 2) (stating that the email was sent prior to issuance of the permit). On the basis of that email, the Magistrate Judge concluded that no permit authorized any demonstration activities on the White House sidewalk.

In fact, although the written permit issued on September 23 identified only the Ellipse and Lafayette Park as the designated location of the demonstration, nothing in that permit purports to revoke the previously issued permit for the White House sidewalk that had been deemed granted months earlier.  *See* Gov't Ex. 1.  Nor does it recite any reason for revoking that previously issued permit, even though the NPS regulations require such a revocation to be in writing and to be based on a specific ground enumerated in the regulations.  36 C.F.R. § 7.96(g)(6).  To the contrary, the written permit identified the White House sidewalk as the location of some of the planned activities.  *See* Gov't Ex. 1.  Given that the written permit says nothing about revocation and cites no basis for revocation, it was not a valid revocation under the regulations.  36 C.F.R. § 7.96(g)(6).  And since the permit for the White House sidewalk thus was not properly revoked, the arrestees were not demonstrating "without a permit."

Revocation could, of course, be appropriate when an applicant wishes to cancel or change the content of an existing permit.  Merryman thus testified, sensibly enough, that a permit, once issued, can be amended at the request of the applicant so long as the request is made in writing.  Tr. 12-13, Nov. 17, 2005.  The regulations nonetheless require the revocation itself to be in writing and to specify the grounds for revocation, 36 C.F.R. § 7.96(g)(6), and there is no exception to that requirement for revocations based on the request of the applicant.  It is therefore irrelevant whether the email message clearly communicated its author's desire to remove the White House sidewalk from the scope of the IPR permit; what is controlling is whether the NPS issued a valid, written revocation removing the White House sidewalk from the extant permit.  Here, there was no such revocation.

Lacking the guidance of a clear, written revocation, none of the alleged demonstrators had any notice as to the lack of a permit.  Merryman testified that no notice was sent to any

23

prospective demonstrator of the purported removal of the White House sidewalk from the scope

of the permit. Tr. 18, Nov. 17, 2005. And since the written permit issued on September 23 said

nothing about revoking the permit for the White House sidewalk, it could not have provided

notice to participants that there was no permit for the White House sidewalk. *See* Gov't Ex. 1.

By failing to comply with the requirement that revocations be made in writing, subject to specific

standards, the NPS failed to give anyone covered by the IPR permit the necessary fair notice that

their conduct was forbidden, *see, e.g.*, *United States v. Nat'l Dairy Prods. Corp.*, 372 U.S. 29,

32-33 (1963) ("[C]riminal responsibility should not attach where one could not reasonably

understand that his contemplated conduct is proscribed.") – notice that is especially important

where a criminal law "abut[s] upon sensitive areas of basic First Amendment freedoms,"

*Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972) (citation omitted).[18]

      Compounding the absence of any notice of the purported revocation, other factors at play

on the day of the demonstration left participants with no indication that their activities on the

White House sidewalk were unlawful. Most notably, the police never directed demonstrators not

to go onto the sidewalk. To the contrary, the police established a friendly and professional

rapport with the demonstrators, allowing them to present their petitions and demonstrate in a

"festive" atmosphere on the White House sidewalk for several hours and at times even helping

them to obtain food and water from other demonstrators in Lafayette Park. Tr. 56-58, 86-87,

Nov. 17, 2005. This conduct was consistent with the general policy of the Park Police not to

shut down peaceable First Amendment assemblies in the absence of a violation of law that is

---

[18] The ambiguity surrounding whether the IPR permit covered the White House sidewalk raises
particular concerns from a Due Process perspective, since it is often the specific terms of a
written permit that provide the "mechanism for generating practical and comprehensible
standards" necessary to save a permit requirement from impermissible vagueness. *Thomas v.
United States*, 696 F. Supp. 702, 711 (D.D.C. 1988).

unrelated to the existence or lack of a permit, *see id*. at 19, 23 (NPS official Merryman acknowledging that IPR was informed of Park Police policy not to shut down a demonstration without a permit on the White House sidewalk in the absence of a violation of the NPS regulations), and it plainly would indicate to anyone that demonstrating on the sidewalk was acceptable to the police.[19]  Consistent with the lack of a written revocation and the Park Police's cooperation and de facto approval of the demonstration in its first several hours, Ms. Sheehan testified that she never thought that she was in need of a permit, *id*. at 109-110, and learned that she was "demonstrating without a permit" only after she was arrested, *id.* at 107.

In sum, there was no dispute that a permit to demonstrate on the White House sidewalk was deemed granted.  The Government failed to establish, beyond a reasonable doubt, that the permit was validly revoked in a manner consistent with the regulations and that sufficient notice of the revocation was given to the participants.  And the Park Police acted as if there was a permit, right up until they issued warnings and instructions to leave.  Therefore, even assuming that the Government presented any evidence to show that Ms. Sheehan was "demonstrating" within the meaning of the NPS regulations – which it did not – the evidence was not sufficient to establish that she was demonstrating "without a permit."

## CONCLUSION

For these reasons, this Court should reverse the judgment of conviction.

---

[19] This policy is also consistent with law governing the D.C. Metropolitan Police Department's treatment of demonstrations and similar events.  Under the D.C. First Amendment Rights and Police Standards Act of 2004, "[i]t shall not be an offense to assemble or parade on a District street, sidewalk, or other public way, or in a District park, without having provided notice or obtained an approved assembly plan."  D.C. Law 15-352, § 105(a) (codified at D.C. Code § 5-331.05(a)).  Similarly, "[a]n order to disperse or arrest assembly participants shall not be based solely on the fact that a plan has not been approved for the assembly."  *Id.* § 107(f)(2) (codified at D.C. Code § 5-331.07(f)(2)).

Respectfully submitted,


 /s/ Jennifer M. O'Connor
David S. Cohen (D.C. Bar No. 426683)
Jennifer M. O'Connor (D.C. Bar No. 460352)
WILMER CUTLER PICKERING
 HALE AND DORR LLP
2445 M Street, N.W.
Washington, D.C. 20037
(202) 663-6000
(202) 663-6363 (facsimile)

*Counsel for Appellant Cindy Sheehan*

Cindy Sheehan
935 Regal Road
Berkeley, CA 94708


Date: April 24, 2006

## CERTIFICATE OF SERVICE

   I hereby certify that copies of this brief and attachments were served by U.S. mail, first class postage prepaid, to the persons identified below on April 24, 2006.

Stephanie Allen
2075 Lewis Road
South Wales, NY 14139

Anna L. White
1709 Lamont Street, N.W.
Washington, D.C. 20010

Annamaria Caldara
27 South 4th Street
Banger, PA 18013

John Barber
778 N.W. 44th Terrace #202
Deerfield Beach, FL 33442

Joseph A. Robbins
4505 31st Street
Mount Rainier, MD 20712

Andrew C. Schoerke
212 Middle Road
Shaftsbury, VT 05262

John Rodgers
5431 N.E. 20th Avenue
Portland, OR 97211

Rabbi Arthur Waskow
6711 Lincoln Drive
Philadelphia, PA 19119

Eve L. Tetaz
2551 17th Street, N.W.
Washington, D.C. 20009

*Defendants Pro Se*

          /s/ Jennifer M. O'Connor