United States v. Sheehan, No. 05-MJ-649-AK

ATTACHMENT 5
(PART A)

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


In Re:  TICKET HEARINGS          :      November 17, 2005
                                 :
                                 :      9:00 a.m.
                                 :
. . . . . . . . . . . . . . . . :


DAY 2
TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MAGISTRATE ALAN KAY
UNITED STATES DISTRICT MAGISTRATE JUDGE


APPEARANCES:


For the Government:             CATHARINE A. HARTZENBUSCH, ESQ.
                                U.S. Attorney's Office
                                555 Fourth Street, N.W.
                                Washington, D.C.  20001


For the Defendant               JON W. NORRIS, ESQ.
Cindy Sheehan:                  641 Indiana Avenue, N.W.
                                Second Floor
                                Washington, D.C.  20004


Court Reporter:                 PATTY ARTRIP GELS, RMR
                                Official Court Reporter
                                Room 4800-C, U.S. Courthouse
                                Washington, D.C. 20001
                                (202) 962-0200


Proceedings reported by machine shorthand, transcript produced

by computer-aided transcription

1    Q.  And please, if you could explain to the Court, how that came

2    about.

3    A.  It came about in the meeting.  It had not been put on the

4    original application.  The group is speculating at the time of

5    possibly conducting demonstration activity on the White House

6    sidewalk.  So in order to lock it in on the application and on

7    our activities board, we have them add that to the application,

8    and then we have them initial it.

9    Q.  Okay.  And then subsequent to the White House being included

10   on the application, ultimately was a permit issued for a

11   demonstration on the White House sidewalk as a result of these

12   applications?

13   A.  The permit for the White House sidewalk -- a permit was not

14   issued, but after 24 hours it is deemed granted --

15   Q.  Okay.

16   A.  -- you know, by regulation.

17   Q.  Okay.  So the effect -- so if you could just explain to the

18   Court, what is the effect of applying for a permit to

19   demonstrate including the White House sidewalk that is not

20   denied by the Park Service within 24 hours?

21   A.  Could you repeat that?

22   Q.  Yes.

23   A.  It is not clear.

24   Q.  If someone applies for a permit and included in the

25   application is a statement that they want to include

1    demonstrating on the White House sidewalk, if that application

2    is not denied within 24 hours, what is the result?

3    A.   The result is that it is deemed granted.

4    Q.   Okay.  And what if an applicant thereafter withdraws or

5    cancels the request to demonstrate on the White House sidewalk?

6    A.   Then that would be a cancel off the application, if you

7    will.

8    Q.   Okay.  And if the permit has already been issued and the

9    applicant cancels the request for the White House, what happens?

10   A.   Well -- if the permit was issued with the White House

11   sidewalk on the permit?

12   Q.   No.  I am just asking the practice of the Park Service if an

13   applicant asks to demonstrate on the White House sidewalk and

14   the permit is issued in writing and then, after the permit is

15   issued, the applicant withdraws the request or cancels the

16   request to include the White House sidewalk.

17   A.   Well, first of all, we would require something in writing

18   from the applicant indicating that they wish to withdraw the

19   White House sidewalk from the permit, and then we subsequently

20   would amend the permit to remove the location on the permit.

21   Q.   Okay.  And if the permit has not yet issued when the request

22   to include the White House sidewalk is canceled or withdrawn,

23   what happens then?

24   A.   Well, the permit would be issued minus -- it would be issued

25   for the areas that they are still requesting, but it would not

1   be issued for the White House sidewalk.

2   Q.  And is that what happened here?

3   A.  Yes.

4        MS. HARTZENBUSCH:  The Court's brief indulgence.

5        (Pause.)

6   BY MS. HARTZENBUSCH:

7   Q.  Among the records of the Park Service related to this permit

8   application and issuance, was there, in fact, anything in

9   writing that you relied on to determine that the organizers did

10  not wish to have a permit issued for the White House sidewalk?

11  A.  Yes, we had received an e-mail by the applicant.

12  Q.  Okay.  And is that included among the --

13  A.  Yes.

14  Q.  In the exhibit?

15  A.  Yes, it is.

16  Q.  Okay.  Now, the fact that -- could you explain to the Court

17  the effect of the description of the proposed activities in the

18  "purpose" section of the permit?  Is that a grant of authority

19  for what is proposed to occur?

20  A.  In the "purpose" section as far as what's issued for the

21  permit for Lafayette Park and the Ellipse, that is the granted

22  authority.  Some other information is just for informational

23  purpose only.

24  Q.  Okay.  So by including information about what was proposed

25  in connection with this permit -- let me phrase it another way.

Page 16

1            CROSS-EXAMINATION

2    BY MR. NORRIS:

3    Q.   Good day.  Is it Officer Merryman?  Is that correct?

4    A.   Just Rick Merryman.

5    Q.   Okay.  Mr. Merryman, how is that?

6    A.   I am not an officer.

7    Q.   Okay.  Mr. Merryman, you told the Government that you

8    handled the permit process that led up to the permit being

9    issued; is that correct?

10   A.   Correct.

11   Q.   Okay.  Now, you also talked about this process where, after

12   24 hours, if there is not a response, then a permit is deemed

13   granted; is that correct?

14   A.   That's correct.

15   Q.   Okay.  And that actually happened in this case where, after

16   24 hours -- because the date of the application was well in

17   advance of September 26th, correct?

18   A.   Correct.

19   Q.   Okay.  And so there was, in fact, a permit deemed issued

20   initially for the White House sidewalk, correct?

21   A.   Yes, initially.

22   Q.   Okay.  And that application and the granting -- the deeming

23   granting of the permit for the White House sidewalk was based on

24   an application done by an individual, Gordon Clark, who was with

25   the Iraq Resistance for Peace, correct?

1    subsequently the permit was issued for those two locations.

2    Q.   Okay.  So notice went out to law enforcement that the permit

3    for the White House sidewalk was canceled, correct?

4    A.   Well, the permit went out, yes -- well, they were also, I

5    believe, in the e-mail also notifying that the White House

6    sidewalk was being canceled.

7    Q.   Okay.  And that's the e-mail to law enforcement you are

8    talking about?

9    A.   It was e-mailed to myself and law enforcement personnel.

10   Q.   Okay.  But there was no way that the 1500 people who might

11   attend were ever notified via a public forum or anything that

12   you are aware of by your office?

13   A.   No.

14   Q.   Okay.  Now, this process for obtaining permits with the Park

15   Police also involved correspondence with an individual, John

16   Harasec.  Am I pronouncing that correctly from your office?

17   A.   Correct.

18   Q.   And John Harasec is part of the U.S. Park Police

19   intelligence and counterterrorism unit; is that correct?

20   A.   Correct.

21   Q.   Okay.  And you are aware from e-mails involving Mr. Harasec

22   that there was inquiry about what would happen if there was not

23   a permit for the White House sidewalk, correct?

24   A.   Correct.

25   Q.   Okay.  And Mr. Harasec informed the Mr. Clark that you

1    referred to earlier that if a group does not have a permit for

2    the White House sidewalk, the Park Police will not generally

3    close the area unless individuals violate any regulations in

4    that area; is that correct?

5    A.    That's what his statement indicates, yes.

6    Q.    Okay.    That's a correct -- what I just read was verbatim

7    from his statement and it was correct?

8    A.    Correct.

9    Q.    Okay.    So Mr. Clark was notified that even if there was no

10   permit for the White House sidewalk, one would not be needed

11   because the sidewalk would generally not be closed unless there

12   were other violations?

13         MS. HARTZENBUSCH:    Objection, your Honor.    It calls for

14   this witness to interpret Mr. Harasec's statement.    The

15   statement is in the exhibit and it speaks for itself.

16         MR. NORRIS:    Park Police procedure.

17         MS. HARTZENBUSCH:    This witness is not a member of the

18   Park Police.

19         MR. NORRIS:    Generally is what they are referring to.

20   Park Police procedure on permits, your Honor.

21         MS. HARTZENBUSCH:    Your Honor --

22         MR. NORRIS:    And it is in evidence.

23         THE COURT:    One at a time, Counsel.

24         MR. NORRIS:    It is in evidence, and I am entitled to

25   inquire of this witness as to his understanding of this.    It's

Page 23

1   Q.  And that e-mail is something that you were aware of prior to

2   the issuing of the permit for September 26th, correct?

3   A.  Correct.

4   Q.  Okay.  Not something you are seeing for the first time,

5   correct?

6   A.  No.

7   Q.  Okay.  So you agree that the statement that I read to you

8   earlier from that packet is a correct recitation of the

9   statement made by Mr. Harasec to Mr. Clark in that particular

10  letter, correct?

11  A.  It was statement made by Lieutenant Harasec to the

12  applicant.

13  Q.  Okay.  Thank you.  And in that statement it is saying that

14  if individual demonstrators do not have a permit, the Park

15  Police will generally not close that area unless there is a

16  violation, correct?

17      MS. HARTZENBUSCH:  And, your Honor, the document speaks

18  for itself.

19      THE COURT:  I understand.

20  BY MR. NORRIS:

21  Q.  That's what it says, correct?

22      THE COURT:  Is that your understanding?

23      THE WITNESS:  Unless there is a violation.

24  BY MR. NORRIS:

25  Q.  Thank you.  What the term "will not close the area" means is

1    Q.   The question is, is a permit required to petition the

2    Government in front of the White House?

3              THE COURT:  Do you mean to deliver that petition to a

4    gate in the White House?

5              MR. PARK:  Yes.  And then to wait and request that a

6    meeting be granting with the President and the petitions be --

7              THE COURT:  You are talking about something being

8    presented --

9              MR. PARK:  Right.

10             THE COURT:  -- physically, a piece of paper, or pieces

11   of paper; is that correct?

12             MR. PARK:  Yes, stacks of --

13             THE COURT:  And your question is whether or not a

14   permit is required if more than 25 people seek to present those

15   pieces of paper --

16             MR. PARK:  Yes, and wait for the President to come

17   receive them.

18             THE COURT:  I see.  If you could answer that.

19             THE WITNESS:  It was my understanding that a handful of

20   people were going to present a petition and also request a

21   meeting with the President at the northwest gate.  The northwest

22   gate is not within the purview of the White House sidewalk.

23   Therefore, we would not issue a permit for that location.

24             The White House sidewalk is between the East Executive

25   Drive and West Executive, to the northwest gate.

Page 29

1    BY MR. PARK:

2    Q.  So a permit was issued to deliver petitions at the west

3    gate; is that what you are saying?

4    A.  No.

5    Q.  Is a permit required to do that, to deliver petitions?

6    A.  No, sir.  Not from the Park Service because that portion is

7    not covered under our regulations.  That would be a matter

8    either with Secret Service or the Metropolitan Police

9    Department.

10   Q.  So it's not required for that area.  And would a permit be

11   required for a number of people to then assemble in front of the

12   White House and request that those petitions be received as a

13   First Amendment right to petition for grievances?

14         MS. HARTZENBUSCH:  Your Honor, that does call for

15   speculation.

16         THE COURT:  If he can answer it, Ms. Hartzenbusch, I am

17   going to let him.

18         THE WITNESS:  A brief request for demonstration -- to

19   conduct a demonstration --

20   BY MR. PARK:

21   Q.  That's not what I asked.

22   A.  Well, I don't understand your question, then.

23   Q.  I said to bring some petitions to the Government and at --

24   requests for grievances for things done such as wars and crimes,

25   criminal activity.

Page 32

1          MR. PARK:  I think the issue at stake is the difference

2     between --

3          MS. HARTZENBUSCH:  Your Honor --

4          THE COURT:  Let him finish, Ms. Hartzenbusch.

5          MS. HARTZENBUSCH:  Very well.

6          THE COURT:  Yes.

7          MR. PARK:  The difference between petitioning for

8     redress of grievances guaranteed under the First Amendment and a

9     demonstration.  So -- that's basically what I am saying.

10         THE COURT:  Ms. Hartzenbusch?

11         MS. HARTZENBUSCH:  That seems to be a matter for

12    argument.

13         THE COURT:  Yes.

14         MR. NORRIS:  Your Honor, could I do a followup based on

15    something -- not the last one, but something that came out

16    during that cross?

17         THE COURT:  All right.  If it is limited to that area.

18         MR. NORRIS:  Yes.

19                    FURTHER CROSS-EXAMINATION

20    BY MR. NORRIS:

21    Q.  In terms of delivering the petitions to the White House

22    gate, I believe you stated that the White House gate is separate

23    and apart from the area where Park Service would issue a permit;

24    is that correct?

25    A.  Correct.

1    Q.   And you said maybe some other agency, like MPD, may or may

2    not issue permits for that area?

3    A.   The White House gate itself, within the gate, is controlled

4    by the Secret Service.  The street in front of the White House

5    is going to be controlled by the Metropolitan Police Department.

6              THE COURT:  Is or is not?

7              THE WITNESS:  Is.

8              THE COURT:  It is.

9    BY MR. NORRIS:

10   Q.   And I would like to show you what will be marked as Defense

11   Exhibit Number 1.

12        (Whereupon, Defense Exhibit No. 1 was marked for

13   identification.)

14   BY MR. NORRIS:

15   Q.   If I could show you what was marked as Defense Exhibit

16   Number 1.  It's fair to say that's a copy of a photograph; is

17   that correct?

18   A.   Yes.

19   Q.   Okay.  And the area shown there is the White House gate; is

20   that correct?

21   A.   It appears to be.

22   Q.   Okay.  You have seen the gate before, and it looks similar,

23   correct?

24   A.   It has been a while.

25   Q.   And that's fair and accurate representation?

1    procedure.

2            THE COURT:  Yes.

3            MS. HARTZENBUSCH:  Mr. Norris is here representing

4    Ms. Sheehan only, and I object to any argument being made on

5    behalf of the pro se Defendants who have not retained him as

6    their representative.  His agreement in playing the role of

7    attorney advisor was not to have a speaking role.

8            THE COURT:  All right.  That representation was made,

9    and I am going to allow him some leeway and permit him -- since

10   this is a bench trial, not a jury trial.

11           MR. NORRIS:  Thank you, your Honor.  So that's the

12   legal issue as to whether or not a permit had, in fact, been

13   issued and whether or not these individuals had notice that they

14   were violating the law.

15           And we think the Government has not met its burden on

16   that issue, your Honor.

17           THE COURT:  Is there any evidence before this Court as

18   to how the individuals who attended the demonstration on that

19   particular date were notified that any form of permit was

20   issued?

21           MR. NORRIS:  No, there is not at this time, your Honor.

22           THE COURT:  I see.  All right.

23           MR. NORRIS:  So for all those reasons, we think that

24   the Government has not met their burden, your Honor.

25           In addition, there is a factual basis, and the factual

Page 48

1   basis is the officers that testified, the so-called arresting

2   officers -- and I think it's appropriate to use that term,

3   arresting officers, sort of in quotes here because the officers

4   that testified were not the arresting officers in the true sense

5   of the word.

6        THE COURT:  What is the true sense of the word?  You

7   are an experienced criminal practitioner, Mr. Norris.  What is

8   the true sense of the word "arresting"?

9        MR. NORRIS:  An officer that is involved in an arrest,

10  meaning taking someone into custody.

11       THE COURT:  So the arresting officer has to be an

12  individual, as far as you are concerned -- that before an

13  individual is arrested, an individual has to --

14       MR. NORRIS:  -- have some knowledge of the offense.

15  What the Government put up here --

16       THE COURT:  I see.

17       MR. NORRIS:  -- were basically officers who were

18  working in a more sort of bureaucratic basis in terms of

19  processing people who had been arrested.  In fact, Officer

20  Fuller testified that he had been assigned 40 arrestees.

21  Officer Davis said she was over accepting people at the bus who

22  had already been in police custody.

23       So for all of those reasons, we don't think that there

24  has been proper identification of the Defendants as individuals

25  who have broken the law.

1    demonstrated, the participants were given audible warnings and

2    were given three opportunities to leave.  If notice is required,

3    that notice was given at that time.

4        So the warnings provide any notice required under the

5    law for purposes of determining whether the Government has

6    introduced sufficient evidence to survive a Motion for Judgment

7    of Acquittal.

8        THE COURT:  All right.

9        MS. HARTZENBUSCH:  And the Government will submit on

10    the remainder of the evidence.

11        THE COURT:  All right.

12        MR. NORRIS:  Your Honor, could I just respond to two

13    points very briefly?

14        THE COURT:  Briefly.

15        MR. NORRIS:  Your Honor, as to the Government's

16    argument about any warnings given on the scene by the U.S. Park

17    Police or others, there is no evidence that those warnings said

18    to demonstrators that they do not have a permit to be in that

19    area.  The warnings might have been of some other nature, that

20    they would have to do certain things or face arrest, but they

21    were not warnings that they did not have a permit.  So we don't

22    think that addresses the notice issue that I raised.

23        And secondly, while some of the officers talked about

24    seeing demonstrators or demonstration going on or various things

25    related to demonstrations going on, what's clear is the

Page 52

1  officers, you know -- specifically, Officer Fuller who received

2  40 arrestees -- they did not connect up that conduct with the

3  individuals that they later processed.

4      THE COURT:  All right.  Is it the position of

5  Ms. Sheehan that there was, in fact, a permit issued for

6  demonstration by her and more than 25 other people to

7  demonstrate in front of the -- on that sidewalk, that south

8  sidewalk of Pennsylvania Avenue?

9      MR. NORRIS:  It's the position of Ms. Sheehan that

10 there was, in fact, a permit deemed enacted, as Officer

11 Merryman -- or Mr. Merryman testified to, your Honor.

12     THE COURT:  I see.

13     MS. HARTZENBUSCH:  May the Government inquire what

14 Mr. Norris means by "enacted"?

15     MR. NORRIS:  Based on the officer's testimony that a

16 permit is issued or enacted if it's not responded to or denied

17 affirmatively within 24 hours.  He said that one was issued or

18 enacted.  And I think I have made that argument to the Court, so

19 I don't mean to go back over it.  But that is our position.

20     THE COURT:  All right.

21     MR. NORRIS:  Thank you, your Honor.

22     THE COURT:  Thank you, Mr. Norris.  The Court is going

23 to deny the Motion without prejudice and permit the case to go

24 forward.  And you may begin your case in chief, Mr. Norris.

25     DEFENDANT WASKOW:  Your Honor, Rabbi Arthur Waskow,

1  and your address, and what work you do.

2  A.   My name is Manijeh Saba, M-A-N-I-J-E-H.   Saba, S-A-B-A.   I

3  am -- I live in 146 Emerson Road in New Jersey.  I am a field

4  manager for canvassing for New Jersey Citizen Action.  And I

5  also do court interpretation and translations, among other

6  things that I do.

7  Q.   Thank you.  Directing your attention to September 26, 2005,

8  where were you that afternoon?

9  A.   I was on the sidewalk of the White House.

10 Q.   How did you get there and why did you get there?

11 A.   I came in the morning.  I think it was about 9:00, 10:00.  I

12 came to the area and -- I came to the Lafayette Park.  And I had

13 come to continue the demand for stopping this illegal,

14 unethical, anti-human rights activity that has been started

15 since September 11th and has culminated in Iraq war, invasion of

16 Iraq and other country, killing people that we have no knowledge

17 who they are.

18       THE COURT:  No.  I think -- answer the question as to

19 the reason you came.

20       THE WITNESS:  That's the reason I came.

21       THE COURT:  I understand.

22       THE WITNESS:  And I came to petition the Government, as

23 a responsible citizen, and ask for my grievances, among millions

24 of others, to be heard.  I responded to why we have not been

25 receiving any response from the President who says the state of

1    Process and add my voice as representative of millions

2  of others to be there.

3  Q.  Was there any kind of police barricade or warning to warn

4  you not to approach the White House sidewalk at that point?

5  A.  There were barricades there, but they were open.  There were

6  whole large -- about -- I guess I'd say about 20 feet of it was

7  open.  So it was -- we just walked in.  There was no barrier for

8  me not to walk in.

9  Q.  Okay.  So you didn't have to climb over a barricade or

10  anything?

11  A.  No, I did not.

12  Q.  Thank you.  Just pursuing the barricade question, when did

13  the barricades get closed off?

14  A.  Long after we had walked in.  I and lots of other people had

15  walked in.  The barricade was open.  And actually I remember at

16  that time there were lots of police officers standing like a

17  wall against the fence of the White House.  And they stood there

18  for a while, and then they walked away while we were just

19  there -- and we sat down and all that.

20  Q.  Were there also police officers in the middle of

21  Pennsylvania Avenue?

22  A.  Yes.

23  Q.  Did you have any inter -- contact with any of them?

24  A.  No.

25  Q.  Did you see any of them, for example, bringing bottles of

1    water from [sic] supporters on the other side of that police

2    line in Lafayette Park to those who were on the White House

3    sidewalk?

4    A.  One -- actually, after a while that we were on the sidewalk,

5    water was coming, Pizza Hut comes, food was coming, just like we

6    were petitioning and the police actually almost like assisting

7    us in making our grievance clear to the President who apparently

8    has become deaf maybe a long time ago.

9    Q.  Did this behavior by the police in bringing water and so on

10   instill in you the feeling that you were doing a criminal act,

11   or did it instill in you the feeling that police felt fine about

12   what you were doing?

13   A.  Actually, the whole atmosphere, it was very unusual for me

14   to see -- and the police was very professional, and they were

15   almost like with us.  They were part of us.

16          I have seen the police constantly being us against

17   them, but this time it was not anything like --

18          THE COURT:  I am going to sustain the objection.

19          THE WITNESS:  I am sorry.  I didn't hear that.

20          THE COURT:  We are focusing in on the 26th.

21   BY DEFENDANT WASKOW:

22   Q.  So on the 26th at that time you did not have the feeling

23   that what you were doing was criminal in the eyes of the police?

24          MS. HARTZENBUSCH:  Your Honor, I am going to object to

25   the leading --

1          THE WITNESS:  No.

2          MS. HARTZENBUSCH:  I am going to object to the leading

3    nature of the question.

4          THE WITNESS:  I'm sorry.

5    BY DEFENDANT WASKOW:

6    Q.  Ms. Saba --

7          THE COURT:  I don't know if you know what a leading

8    question is.  You are not trained in the law -- sometimes

9    lawyers don't know how to conduct Direct Examination.  But you

10   should not ask a question that in and of itself suggests the

11   answer to the question.  So be careful that you don't couch your

12   questions in a way that tells you and the Court what the answer

13   should be.

14         DEFENDANT WASKOW:  Thank you, your Honor.

15   BY DEFENDANT WASKOW:

16   Q.  Ms. Saba, what feelings were instilled in you by this

17   behavior of the police?

18   A.  I thought that -- you know, I was very festive.  At the same

19   time that I had lots of reservation about not being heard.  But

20   we were with other people, and we were doing, you know, what we

21   did, and we were okay.

22         But the police -- I felt that the police was there to

23   protect us from other people that they didn't want us to hear --

24   to petition the Government.

25   Q.  Thank you.  Did you yourself hear a police announcement that

1    this was -- that required people to leave the sidewalk?

2    A.  At some point, I saw the police, but I couldn't hear them

3    well because there was also chanting and praying was happening.

4    And I was about three, four feet from the fence.  So I wasn't --

5    I couldn't hear everything that they said.

6    Q.  So do I understand that you did not hear them make an

7    announcement requiring people to leave?

8    A.  I heard it, but if you are asking me in detail what they

9    said, I wouldn't be able to say that, even then.  But I knew

10   that they were telling us that, you know, you may want to leave.

11   Q.  Okay.  By the time that announcement was made, were police

12   barricades closed and would you have had to climb -- I don't

13   know if this is leading or not.  With the police barricades

14   closed, would you have had to climb over them in order to leave?

15   A.  I think they were.  They had closed after -- lots of people

16   got in, and then they closed the barricade.  And so I had to

17   climb up the barricade to leave, yes, if I had decided.

18   Q.  Thank you.  Why -- after the petitions were rejected at the

19   guard house, why did you remain in front of the White House?

20   A.  Even the question makes me very uncomfortable.  I had

21   traveled -- I have a lot -- I am a very busy person.  I have a

22   lot of things to do.  I have a very wonderful life and a

23   wonderful family.  I have traveled -- I have come there for

24   three days to petition the Government and ask the Government to

25   hear us and stop, in my name, to kill people and have an

1    MS. HARTZENBUSCH:  Objection, your Honor.  Relevance.

2    THE COURT:  What's the relevance of that, Rabbi?  The

3 charge that is before the Court, and the only charge, is that

4 Ms. Saba was demonstrating, along with a group of people in

5 excess of 25 in number, without a permit.  And her intent,

6 albeit a well-meaning intent, as far as this Court is concerned,

7 is not relevant.  Why do you believe it is relevant to whether

8 or not she should have had or not have had a permit?

9    DEFENDANT WASKOW:  For two reasons, your Honor.  One is

10 that, as I understand, part of criminal action is criminal

11 intent, and the intent on the part of the person who is charged

12 has some bearing on whether the person has done a criminal act.

13 That's the first reason.

14    Perhaps I should pause there.

15    THE COURT:  Well, are you suggesting that you are

16 trying to elicit a response as to why Ms. Saba was on that

17 sidewalk knowing that she did not have a lawful permit to be

18 there?  Is that the intent you are talking about?  Or are you

19 talking about the criminal intent that's lacking for her to

20 demonstrate?  I am not sure I understand where the criminal

21 intent comes into it.

22    DEFENDANT WASKOW:  Well, of course, she hasn't said she

23 was demonstrating.  She said she came to help bring and support

24 those who were bringing a petition, and remained on the sidewalk

25 as kind of a living petition.

1          THE COURT:  I understand that, but the issue before the

2    Court is whether or not she had a right to do that without a

3    permit.  That's the issue.

4          DEFENDANT WASKOW:  The second possibility, your

5    Honor -- so the first possibility is --

6          THE COURT:  I can't deal in possibilities.  I have to

7    deal with what is there.

8          DEFENDANT WASKOW:  The first aspect of what I am trying

9    to elicit from the Defendant is whether she did come with that

10   intention to violate the law, or came with a totally different

11   intention.  So that, for example, if she had come with an

12   intention to prevent tourists or to stop Government officials or

13   something like that, that would be quite different from an

14   intention only to be a living petition, not to interfere with

15   anybody else.

16         THE COURT:  No.  I understand exactly what you are

17   saying, Rabbi; however, it is not relevant to the issue that's

18   before the Court.  So I am going to sustain the Government's

19   objection.

20         DEFENDANT WASKOW:  Sir, I never said what my second --

21   the second aspect.

22         THE COURT:  All right.  I will listen to your second

23   aspect.

24         DEFENDANT WASKOW:  Okay.  So the second aspect goes to

25   the way in which and the purposes for which the permit