United States v. Sheehan, No. 05-MJ-649-AK

ATTACHMENT 5
(PART B)

1  Q.  Okay.  And if it were up to you, you would have stayed there

2  longer than you, in fact, stayed?

3  A.  Yes.

4  Q.  And when you were standing there on the White House

5  sidewalk, you were expressing your views?

6  A.  Yes, I was.

7  Q.  Did you apply for a permit?

8  A.  No, I didn't.

9        MS. HARTZENBUSCH:  The Court's brief indulgence.

10       DEFENDANT WASKOW:  Your Honor, Redirect.

11       THE COURT:  No.  No.  Ms. Hartzenbusch asked for the

12  Court's indulgence, which in the language of the Court, she is

13  asking to be permitted to consult with her associate.  She

14  hasn't finished her Cross-exam.

15  BY MS. HARTZENBUSCH:

16  Q.  To your knowledge, did anyone have a permit?

17  A.  I don't know if anyone had a permit.  I didn't before I came

18  here.

19  Q.  Okay.  But when you were standing on the White House

20  sidewalk on September 26th, at times singing with the others,

21  you were there voluntarily?

22  A.  Yes.

23       MS. HARTZENBUSCH:  I have no further Cross, your Honor.

24       THE COURT:  Ms. First, you asked -- you were asked a

25  question, I think, about hearing an announcement.  During the

1    time that you were standing there, did you at any time hear

2    someone speaking through some sort of amplification system or

3    loudspeaker system?

4         THE WITNESS:  No, I didn't.

5         THE COURT:  And you said you were engaged in talking

6    with people and chanting.

7         THE WITNESS:  Not chanting.  Singing.

8         THE COURT:  Singing.  Singing.  All right.  Well, there

9    has been testimony about chanting -- all right.  That you were

10   talking to other people and singing --

11        THE WITNESS:  Yes.

12        THE COURT:  -- and at no time during the period of time

13   from the time that you had done what you did in terms of hanging

14   something on the gate and standing next to the -- I guess near

15   the gate, you never heard any announcement that came over some

16   sort of loudspeaker?

17        THE WITNESS:  No.

18        THE COURT:  That's correct?  All right.

19        Anything further with this witness, Rabbi?

20        DEFENDANT WASKOW:  Your Honor, I think you asked

21   precisely the question I intended to ask.  Thank you.

22        THE COURT:  All right.  You may step down, Ms. First.

23        (Witness excused.)

24        THE COURT:  Next witness?

25        DEFENDANT WASKOW:  Your Honor, the defense calls

1    A.  We elected to leave them at the gate, hoping that perhaps,

2    in our absence, they would be picked up and taken to the

3    executive office.

4    Q.  And then after leaving them in that hope, what did you do

5    next?

6    A.  Walked along the fence area to the center of the White House

7    sidewalk.

8    Q.  What was your intention at that point?

9    A.  To be a visible presence of opposition to the war in front

10   of the White House.

11   Q.  Did you find any blockade preventing you or attempting to

12   prevent you from walking onto that area?

13   A.  I did not.

14          MS. HARTZENBUSCH:  Objection, your Honor.

15          THE COURT:  She has answered the question.

16          DEFENDANT WASKOW:  I am sorry.

17          THE COURT:  The question has been answered, and I am

18   going to let it stand.  This is a bench trial.  I can sift out

19   what is relevant and what isn't.  So the answer will stand.

20          Ask your next question.

21          DEFENDANT WASKOW:  I see.  You mean from other

22   witnesses.  I am sorry --

23          THE COURT:  No.  You asked a question, and the witness

24   answered the question.  The Government objected.  And I said I

25   am going to let the answer stand.

1          DEFENDANT WASKOW:  Oh.  I didn't even hear the answer

2     myself.

3          THE WITNESS:  Would you like me to repeat it?

4     BY DEFENDANT WASKOW:

5     Q.  Please do.

6          THE COURT:  Then in that case, I will sustain the

7     objection.  So maybe one of your colleagues may tell you what

8     she said.

9          DEFENDANT WASKOW:  Thank you, your Honor.

10          THE COURT:  You have to listen carefully to these

11     witnesses.  They speak very rapidly.

12     BY DEFENDANT WASKOW:

13     Q.  So once you were on the sidewalk in front of the White

14     House, what did you do and how long did you remain there?

15     A.  I was there several hours among other people, colleagues.  I

16     chanted, I sang, I spoke to people who were at a distance on the

17     other side of the police line.  I held signs.  I walked about.

18     I talked to the police.  I was, you know, doing all kind of

19     things during a period of several hours.

20     Q.  Were you given any food or water, or did you see any others

21     on the sidewalk given food or water?

22          MS. HARTZENBUSCH:  Objection, your Honor.  Irrelevant.

23          THE COURT:  It's not relevant, but I will let her

24     answer it.  The answer is yes or no.

25          THE WITNESS:  Yes.  And, in fact, I asked for food from

Page 87

1    a friend in Lafayette Park, and they -- a policeman delivered it

2    to me.

3    BY DEFENDANT WASKOW:

4    Q.  Thank you.  Did you feel at that point as if you were

5    violating the law when the policeman gave you the food?

6           MS. HARTZENBUSCH:  Objection, your Honor.

7           THE COURT:  I will sustain the objection.

8    BY DEFENDANT WASKOW:

9    Q.  Did you hear any public announcement about violating a

10   regulation?

11   A.  No, I did not.  There was too much going on, too much noise.

12   Q.  When you were placed under physical arrest; that is,

13   actually, literally taken into custody, did the police person

14   who did that inform you of under what authority he or she was

15   doing that?

16          MS. HARTZENBUSCH:  Objection.

17          THE COURT:  Sustained.

18          DEFENDANT WASKOW:  Your Honor, perhaps I don't

19   understand.  It seems to me that --

20          THE COURT:  You don't understand the objection or the

21   Court's ruling?

22          DEFENDANT WASKOW:  I guess I don't understand the

23   Court's ruling.

24          THE COURT:  The Court's ruling based on the objection

25   is that the question asked is, did you inquire as to the

1   Q.   Could you tell us a little bit about your family?

2   A.   I have two daughters and a son.  My oldest daughter, Carly,

3   is 24.  My son, Andy, is 21.  My daughter, Jamie, is 19.  And my

4   son, Casey, would be 26 if he wasn't killed in the illegal and

5   immoral war in Iraq on April 4, 2004.

6   Q.   Okay.  And Ms. Sheehan, I would like to ask you both about

7   the events of September 26th, '05, and what led up, in your

8   mind, to that day.  Where were you on September 26th, 2005?

9   A.   At what time?

10  Q.   In the middle of the afternoon.

11  A.   I was by the White House.

12  Q.   Okay.  And could you tell the Court why it was you chose to

13  come to the White House on that particular day?

14  A.   Because many times at, often times, great expense to myself

15  monetarily, physically, emotionally, I have tried to petition my

16  Government for redress of wrong, and I have never been answered.

17          So on that day I wanted to join in solidarity with the

18  people present, hundreds of people present and millions of

19  people around the country, to ask for a redress of my wrongs to

20  the President of the United States.

21  Q.   And could you tell the Court just about some of the things

22  you have done in an attempt to petition your Government?

23  A.   Well, of course, I have written dozens of articles and

24  letters to the editor.  I have never taken out an ad in the

25  paper because that costs a lot of money, but I have written

1    letters to the editor, articles that have been published in hard

2    copy and all over the internet.  I have faxed and e-mailed the

3    President.  I had actually gone to his vacation home in Crawford

4    to ask for a meeting.

5         And I have met with not only my Congress people, but

6    dozens of Congress people, many Senators.  You know, I have met

7    with them in person to ask for redress of wrongs.  And it has

8    taken, like I said, a toll physically, emotionally and

9    monetarily on me.  And I have not ever once had an answer to my

10   question which is, what noble cause did my son die for?  What

11   noble cause did over 2,000 -- almost 2100 Americans die for, and

12   tens of thousands of innocent Iraqis?  And why are they still

13   there dying, killing and fighting?

14   Q.  Now, on September 26th, how is it that you arrived at the

15   White House?  Did you come by yourself or with others?

16   A.  I was with my other -- I think four other members of Gold

17   Star Families for Peace, and we arrived there -- we started with

18   the march that marched to the White House gate.

19   Q.  And could you tell the Court what the group Gold Star

20   Families for Peace is?

21   A.  It's a group of families who have had loved ones killed in

22   the -- not just in the Iraq war, but Vietnam, Korea and World

23   War II, the first gulf war.  So -- but mostly it's comprised of

24   people who have lost loved ones in this Iraq war.  And we formed

25   to end -- to end the occupation of Iraq so no other families

Page 101

1    have to go through what we are going through, and also as a

2    support group for each other.

3    Q.  Thank you.  And could you tell us what you and the people

4    that you were with on September 26th did when you arrived at the

5    area around the White House?

6    A.  We went up to the gate and we, again, asked for a meeting

7    with the President.  We had been there September 21st also, Gold

8    Star Families for Peace, to ask for a meeting with the

9    President.

10   Q.  Okay.  Was that -- do you remember how many members of the

11   Gold Star Families for Peace were there on the 21st and how many

12   were there on the 26th?

13             MS. HARTZENBUSCH:  Objection, your Honor, to the 21st.

14             THE COURT:  Limit it to the 26th, Mr. Norris.

15             MR. NORRIS:  Very well.

16   BY MR. NORRIS:

17   Q.  Were you given any response on the 21st?

18             MS. HARTZENBUSCH:  Objection, your Honor, to the 21st.

19             MR. NORRIS:  It goes to her reason for coming back on

20   the 26th, Judge.

21             THE COURT:  No, I am going to sustain the objection.

22             MR. NORRIS:  Very well.

23   BY MR. NORRIS:

24   Q.  Could you tell us how you attempted to do that on the 26th?

25   A.  We walked up to the gate.  We were part of the -- we were

1    taking our reasons to the President to want the occupation of

2    Iraq ended.  My reason was a picture of my son hung around my

3    neck.  And I know I can't bring Casey back, but it's to stop the

4    war so no other mothers have to hang pictures of their sons

5    around their neck.

6              And I went to the guard shack, gate, whatever it is,

7    and I asked -- we all asked to meet with the President.  And

8    they said, well, hang on a second.  And they presumably called

9    or just went in, you know, to, you know, pretend like they were

10   calling.  And then somebody came back and said that, no, nobody

11   from the White House would meet with us.

12   Q.  Okay.  After you were told that no one from the White House

13   would meet, what did you do then?

14   A.  I said that --

15             MS. HARTZENBUSCH:  Objection, your Honor, to hearsay.

16             MR. NORRIS:  I am asking what she did.

17             THE COURT:  I think it is what Ms. Sheehan stated.

18             MS. HARTZENBUSCH:  Yes, an out-of-court statement

19   offered for its truth.  No objection to what Ms. Sheehan did,

20   but objection to hearsay being admitted.

21             THE COURT:  I will let her respond.

22   BY MR. NORRIS:

23   Q.  Thank you, Judge.

24   A.  Well, again, after being rebuffed by a Government

25   official --

Page 103

1      THE COURT:  The question, Ms. Sheehan, is, what

2  Ms. Sheehan said to whom?

3      MR. NORRIS:  Well, I was asking her, what did you do

4  after you were told they wouldn't meet --

5      THE COURT:  Oh, what did she do?  I am sorry.  I

6  thought you said what she said.  You answer what you did.

7      THE WITNESS:  Okay.  I joined with my other members of

8  Gold Star Families for Peace, and we walked over and we sat down

9  on the White House sidewalk.

10  BY MR. NORRIS:

11  Q.  Okay.  And the area of the White House sidewalk, do you know

12  about how far that was from the gate area?

13  A.  Not too far.  Maybe 15, 20 feet.

14  Q.  Okay.  Now, at any time after you sat down did any police

15  officers come and inquire if you had a permit?

16  A.  No.

17      MS. HARTZENBUSCH:  Objection, your Honor.

18      THE COURT:  I don't think it is relevant, but she has

19  answered the question.  Go ahead, Mr. Norris.

20  BY MR. NORRIS:

21  Q.  Did anyone in authority tell you you didn't have a permit?

22      MS. HARTZENBUSCH:  Objection, your Honor.

23      THE COURT:  I will sustain the objection.

24  BY MR. NORRIS:

25  Q.  Now, how long hd you been sitting down in that area that

Page 104

1    afternoon?

2    A.   Before I was picked up?

3    Q.   Yes.

4    A.   Probably around an hour-ish.

5    Q.   Okay.  And could you describe for the Court what it was like

6    being in that location, just in terms of the noise, the

7    activity, things like that.

8    A.   It was really noisy, and the people around me were singing.

9    And then the crowd who had gathered on the other side of the

10   barricade was very noisy.  They were chanting and singing also.

11   So it was a very, very noisy environment.

12   Q.   Okay.  You mentioned the people that were around you and the

13   people on the other side of the barricade.  Could you give us an

14   idea of the size of those two groups?

15   A.   The people around the -- you know, just were right around me

16   was probably a couple dozen.  But I know that there were a

17   couple hundred that were on the side of the barrier.  And on the

18   other side was hundreds -- hundreds of people.

19   Q.   Okay.  And where was the barrier that you were referring to

20   one side or the other?

21   A.   So here is the gate of the White House.  Then the sidewalk

22   part of the street, and then the barrier.

23   Q.   Okay.  So is it fair to say that the barrier was in some

24   portion of the street?  Is that correct?

25   A.   Yes.

ebcefb0e-5eb7-447d-bea9-e30921bd66e1

1    Defendants they identified in court as demonstrating on the

2    White House sidewalk that day.  They also happened to be the

3    ones who arrested those Defendants.

4          MR. NORRIS:  Your Honor --

5          THE COURT:  All right.  I'm going to -- you have

6    approximately 19 minutes left, and that includes closing

7    arguments.  So you may ask -- Ms. Sheehan may answer the

8    question.  There was a deal made last night, so I am going to

9    hold you to it, Counsel.  You understand that.

10          MR. NORRIS:  Absolutely.

11          THE COURT:  All right.

12          You may answer, Ms. Sheehan.

13   BY MR. NORRIS:

14   Q.  Ms. Sheehan, could you tell the Court, after you sat down,

15   what happened?  How the that change?

16   A.  Two officers picked me up.  They took me to the paddy wagon.

17   They put handcuffs on me.  Then I was taken around to the back.

18   I had a picture taken with Officer Davis.  I was put in the

19   paddy wagon, and then I was taken to the jail and written up.

20   And that's when I found out I was demonstrating without a

21   permit.

22   Q.  Okay.

23   A.  And I didn't break that law because I wasn't demonstrating.

24   Q.  Okay.  And Ms. Sheehan, could you tell us, when did you

25   first encounter Officer Davis?  At what location?

1    A.   Behind the paddy wagon.

2    Q.   Okay.   Thank you.

3         MR. NORRIS:   The Court's indulgence.

4         (Pause.)

5         MR. NORRIS:   I have nothing further of Ms. Sheehan.

6    Thank you.

7         THE COURT:   Ms. Hartzenbusch?

8                     CROSS-EXAMINATION

9    BY MS. HARTZENBUSCH:

10   Q.   Good morning, Ms. Sheehan.

11   A.   Good morning.

12   Q.   You first noticed Officer Davis behind the paddy wagon?

13   A.   Exactly.

14   Q.   But you have no knowledge of what, if anything, Officer

15   Davis may have seen prior to you noticing her behind the wagon?

16   A.   Obviously.

17   Q.   And you were on the sidewalk with hundreds of other people

18   on the 26th?

19   A.   Yes.

20   Q.   And there were more than 25 people there?

21   A.   Yes.

22   Q.   And you were expressing your view at that time against the

23   war in Iraq?

24   A.   Yes.

25   Q.   And you were expressing your opposition to that war?

Page 109

1   A.   Yes, as I often do without being arrested.

2   Q.   And getting arrested was part of your expression of

3   opposition to the war in Iraq?

4   A.   No.

5   Q.   You were willing to risk arrest to deliver your message?

6   A.   Yes.

7   Q.   And in fact, you came prepared to be arrested with photo

8   identification with you?

9   A.   No.

10  Q.   You knew that --

11  A.   I had my photo ID with me, but I carry it all over the place

12  without getting arrested.

13  Q.   You were on the White House sidewalk voluntarily?

14  A.   Yes.

15  Q.   And you knew that no permit had been issued and that that

16  was how you were going to get arrested?

17  A.   I didn't think I needed a permit to petition my

18  Government --

19  Q.   Okay.

20  A.   -- because it is in the First Amendment, and the First

21  Amendment doesn't say except, you know, if there's 25 people or

22  more.

23  Q.   That wasn't my question.

24  A.   Oh, I am sorry.

25  Q.   My question was that you knew that no permit had been issued

ebcefb0e-5eb7-447d-bea9-e30921bd66e1

1    and that that was what was going to trigger your arrest or how

2    you were going to get arrested.

3    A.   I didn't know that I needed a permit.

4    Q.   That wasn't my question, though.  You knew that there was no

5    permit, and that was how you were going to get arrested?

6    A.   I didn't go there to get arrested.

7            THE COURT:  Why don't you break it down into two

8    questions.

9            MS. HARTZENBUSCH:  Very well.

10   BY MS. HARTZENBUSCH:

11   Q.   You knew, as a result of your actions, that you risked

12   getting arrested?

13   A.   Yes, I already answered that.

14   Q.   And you chose not to leave the White House sidewalk despite

15   take risk?

16   A.   That's correct.

17   Q.   Okay.  And in fact, how did you leave the White House

18   sidewalk?

19   A.   I was carried out.

20   Q.   So it was not voluntarily by your choice?

21   A.   Right.

22   Q.   You saw police out there during the time that you were

23   sitting on the White House sidewalk?

24   A.   Yes.

25   Q.   And this was not a momentary presence on the White House

1    sidewalk; this was for about an hour?

2    A.  Yeah, maybe a little bit more than an hour.

3         MS. HARTZENBUSCH:  The Court's brief indulgence.

4         THE COURT:  Yes.

5    (Pause.)

6    BY MS. HARTZENBUSCH:

7    Q.  During the time you were on the sidewalk, you testified that

8    it was fairly noisy.

9    A.  Right.

10   Q.  There was chanting going on?

11   A.  Right.

12   Q.  There was singing?

13   A.  Right.

14   Q.  There were some people praying?

15   A.  Right.

16   Q.  And would it be fair to say that there were peaks and lulls

17   to the level of noise --

18   A.  Yes.

19   Q.  -- around you?

20        And you were able to communicate with -- if you chose

21   to, with the people who were in the middle of Pennsylvania

22   Avenue and out towards Pennsylvania -- out towards Lafayette

23   Square?

24   A.  Not where I was sitting, no.

25   Q.  Okay.  And you have met with representatives in Congress

1          THE COURT:  You didn't see any on the sidewalk even

2     though they weren't close to you?

3          THE WITNESS:  I don't think I did.

4          THE COURT:  Okay.

5          MR. NORRIS:  Your Honor, just one brief --

6          THE COURT:  One question, all right.

7                    REDIRECT EXAMINATION

8     BY MR. NORRIS:

9     Q.  Ms. Sheehan, you were asked about the peaks and lulls in the

10    level of sound around you.  Was it ever quiet in that area

11    around you?

12    A.  No.

13         MR. NORRIS:  Nothing further.

14         THE COURT:  All right.  Thank you.  Nothing further.

15    You may step down.

16         THE WITNESS:  Thank you.

17         (Witness excused.)

18         THE COURT:  Defense rests, Mr. Norris, as far as you

19    are concerned with respect to Ms. Sheehan?

20         DEFENDANT ALLEN:  Before the defense rests, I would

21    like to make a statement as a pro se Defendant.

22         THE COURT:  Well, I will give you an opportunity -- you

23    want to make a statement -- no.

24         DEFENDANT ALLEN:  Regarding more time.

25         THE COURT:  Regarding more time?

1    which the Court can take judicial notice of, had there been a

2    permit and no other violations, such as sitting down or not

3    keeping moving or putting signs down, there would not have been

4    a violation, and we wouldn't be here.

5          With respect to the argument that has been raised

6    concerning the necessity of the actions, the Government submits

7    that the Defendants' testimony from their own mouths establishes

8    that they did not meet the legal requirement for necessity

9    defense.  They acknowledged that there were other alternatives

10   to demonstrating before the White House without a permit to make

11   their views known:  Letters to the editor, e-mailing the White

12   House, speaking with their Congresspersons.

13         With respect to the argument that the regulations are a

14   violation of the Defendants' First Amendment rights, as the

15   Government has repeatedly submitted throughout the trial, that

16   is an issue that has been decided by the Circuit -- the D.C.

17   Circuit.  The regulatory scheme by which a permit was required

18   has been upheld as constitutional and, therefore, not violating

19   the First Amendment.  Any temporary delay in applying for a

20   permit for the activity in which the Defendants engaged is not

21   an unconstitutionally impermissible burden on their First

22   Amendment rights.

23         And then with respect to whether or not the Defendants

24   knew that they were violating the CFR, it's well established and

25   axiomatic in the law that ignorance of the law is not a defense.

1    So the fact that they didn't know or that they claimed that they

2    didn't know that their actions were against the law is not a

3    defense.

4            With respect to whether or not any of the Defendants

5    heard the warnings, first, there is the testimony, which is

6    uncontroverted, that the officer in charge who gave the warnings

7    did so over an amplified device, and that all of the officers

8    who testified who were in various places on the sidewalk heard

9    those warnings, and that there was time in between for anyone

10   who wanted to leave to leave.

11           But the Government submits that the warnings are, in

12   fact, not required under the law in order for the Defendants to

13   be guilty of demonstrating without a permit.  What the

14   Government need to prove is that there was no permit and that

15   the Defendants willingly or voluntarily demonstrated with more

16   than 25 people.

17           And it is the joining of the group that does not have

18   the permit that constitutes the basis of the offense.  More as a

19   courtesy or as a means of sifting out for the law enforcement

20   purposes to make sure that they don't arrest someone who is

21   inadvertently on the sidewalk, the warnings were given, the

22   Government submits.

23           But there is no requirement that a warning be given

24   before a Defendant is arrested for a violation that occurs in

25   front of the police officer who then arrests them.

1    not legally justified in committing crimes simply because their

2    messages go unheeded.

3         Additionally, notice about the existence of the permit

4    or lack of a permit is not an element and not a defense of this

5    violation.

6         And finally, the D.C. law referenced by Mr. Norris is

7    not applicable to this offense.  We urge the Court to find the

8    Defendants, all of them, guilty.

9         THE COURT:  All right.  The Court is going to take a

10   few minutes' break to get its papers together at this time and

11   come back and render a verdict.

12        Ladies and gentlemen, we may have a logistical problem.

13   We need a court reporter.  This court reporter has to leave now,

14   and she has other duties.  So we are trying to find out when we

15   can have another court reporter.  So if I -- we may have to come

16   back a little later on this afternoon.  All right.

17        (Pause.)

18        (Bench conference on the record.)

19        MR. NORRIS:  Your Honor, I am just suggesting, since

20   there is a tape backup system -- I know we prefer to have a

21   court reporter, but the Defendants might be willing to waive the

22   right to have a court reporter present as long as the backup

23   tape is in place.

24        MS. HARTZENBUSCH:  The Government has no objection to

25   that.

Page 133

1                          I N D E X

2   GOVERNMENT
    WITNESS:              DIRECT      CROSS      REDIRECT      RECROSS
3   RICHARD MERRYMAN
    By Ms. Hartzenbusch     7
4   By Mr. Norris                      16
    By Mr. Park                        26
5   By Mr. Norris                      32
    By Ms. Hartzenbusch                            35
6   By Mr. Park                                                  39

7   DEFENSE
    WITNESS:              DIRECT      CROSS      REDIRECT      RECROSS
8   MANIJEH SABA
    By Mr. Waskow          53
9   By Ms. Hartzenbusch                69
    By Mr. Norris                      71
10  JOY FIRST
    By Mr. Waskow          73
11  By Ms. Hartzenbusch                79
    GAEL MURPHY
12  By Mr. Waskow          84
    By Ms. Hartzenbusch                90
13  By Mr. Waskow                                  94
    CINDY SHEEHAN
14  By Mr. Norris          98
    By Ms. Hartzenbusch               108
15  By Mr. Norris                                 113

16
                         E X H I B I T S
17  GOVERNMENT'S
    EXHIBIT NO.                       MARKED          RECEIVED
18  1                                                 41

19  DEFENSE
    EXHIBIT NO.                       MARKED          RECEIVED
20  1                                  33             116

21

22

23

24

25

Page 134

1                    CERTIFICATE OF REPORTER

2

3       I certify that the foregoing is a correct transcript from the

4       record of proceedings in the above-entitled matter.

5

6

7

8                              _____

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

ebcefb0e-5eb7-447d-bea9-e30921bd66e1